**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------------X
DR. NICHOLAS JOHNNIDIS,                          :
On Behalf of Himself and All Others              :
Similarly Situated,                              :        Civil Action No.
                                                 :
                            Plaintiff,           :        CLASS ACTION COMPLAINT
            -against-                            :
                                                 :        Jury Trial Demanded
BENCO DENTAL SUPPLY CO.;                         :
HENRY SCHEIN, INC.; and                          :
PATTERSON COMPANIES, INC.,                       :
                                                 :
                            Defendants.          :
------------------------------------------------------------------X
```

**INTRODUCTION**

1.      Plaintiff Nicholas Johnnidis ("Plaintiff") brings this Class Action Complaint on behalf of himself and a Class of direct purchasers (hereinafter referred to as "Class Members") who purchased Dental Supplies supplied by defendant distributors from January 20, 2012 to the present (the "Class Period").

2.      Plaintiff seeks to recover damages incurred by itself and the Class (as defined herein) due to defendants' violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, by: 1) engaging in group boycotting of defendants' competitors or threatening to boycott defendants' competitors; and 2) engaging in group boycotting of companies that did business with defendants' competitors or threatening to boycott companies that did business with defendants' competitors.

3.      As a result of defendants' anticompetitive conduct, Plaintiff and the other Class Members paid more for Dental Supplies than they otherwise would have paid if defendants had not engaged in the unlawful conduct described herein.

4.      Plaintiff makes the allegations herein based on personal knowledge of these matters relating to itself and upon information and belief as to all other matters.

**NATURE OF THE CASE**

5.      Plaintiff alleges that defendants have engaged in an overarching conspiracy to eliminate competition by threatening to boycott or engaging in group boycotting of defendants' competitors and companies that did business with defendants' competitors, thus allowing defendants' to sell Dental Supplies at supra-competitive prices in the U.S. in violation of Section 1 of the Sherman Antitrust Act.  But for defendants' conspiracy, Plaintiff and the other Class Members would not have paid supra-competitive prices for Dental Supplies.  Dental Supplies as used herein include, *inter alia*, anesthetics, burs, cements and liners, crown and bridge products, dental chairs and other dental office equipment, dental CAD/CAM systems, imaging devices, implants, impression materials, instruments, pins and posts, retraction materials, rubber dam materials, waxes, and x-ray accessories.

6.      Plaintiff and the other Class Members sustained damages as a result of defendants' anticompetitive conduct as alleged herein.

**JURISDICTION AND VENUE**

7.      This Court has subject-matter jurisdiction because this action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.  Furthermore, this Court has jurisdiction under 28 U.S.C. §§ 1331 and 1337(a).

8.      Venue is proper in this District pursuant to 15 U.S.C. §§ 15 and 22 and 28 U.S.C. § 1391(b) and (c) because the defendants transacted business in this District during the Class Period and one or more defendants resided in, transacted business in, were found in, or had agents in this

District, and a substantial part of the events and the conduct giving rise to Plaintiff's claims occurred in part in this District.

9.      This Court has personal jurisdiction over each defendant because, *inter alia*, each defendant: (a) transacted business throughout the U.S., including in this District; (b) participated in the distribution of Dental Supplies throughout the U.S., including in this District; (c) had substantial contacts with the U.S., including in this District; and/or (d) was engaged in an illegal scheme and conspiracy to eliminate competition that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the U.S., including in this District.

**PARTIES**

10.      Plaintiff Dr. Nicholas Johnnidis, has a dental practice in Locust Valley, NY, and who directly purchased Dental Supplies from one or more defendants during the Class Period.

11.      Defendant Benco Dental Supply Co. is a Delaware corporation with its headquarters in Pittston, Pennsylvania. Benco sells Dental Supplies to dental practitioners throughout the United States, including in this District. According to its website, "Benco Dental is the largest independent, family owned dental distributor in the United States, with over 400 outside sales people serving over 30,000 customers across the country."

12.      Defendant Henry Schein, Inc. is a Delaware corporation with its headquarters in Melville, New York. Henry Schein sells Dental Supplies to dental practitioners throughout the United States, including in this District. According to its website, Henry Schein is a Fortune 500 Company and "the world's largest provider of health care products and services to office-based dental, animal health and medical practitioners."

13.      Defendant Patterson Companies, Inc. is a Minnesota corporation with its headquarters in St. Paul, Minnesota. Patterson sells Dental Supplies to dental practitioners throughout the United

States, including in this District.   Patterson has two divisions−Dental and Animal Health.

Patterson's website states: "As one of North America's largest distributors of dental merchandise

and technology leaders for dental practices, Patterson Dental offers over 105,000 products and a

wide range of leading equipment, software, technology solutions and services."

14.     Defendants have engaged in the conduct alleged in this Complaint, and/or the

Defendants' officers, agents, employees, or representatives have engaged in the alleged conduct

while actively involved in the management of Defendants' business and affairs.

## FACTUAL ALLEGATIONS

**Investigations of and Actions Against Defendants**

15.     In 2014, the Texas Attorney General ("Texas AG") started investigating Defendants

for anticompetitive conduct in violation of Texas antitrust laws.   On April 9, 2015, the Texas AG

filed a petition against Defendant Benco, alleging that Benco entered into a conspiracy with other

distributors to boycott the 2014 Texas Dental Association ("TDA") annual meeting because the TDA

had partnered with SourceOne, a new Dental Supply distributor.   The petition also alleges that Benco

and other distributors compelled distributors and manufacturers to stop doing business with

SourceOne.   The allegations in the Texas AG action comprise part of the unlawful conspiracy at

issue in this case.   Those allegations include:

- "Building on their historic culture of cooperation and communication, Benco and its competitor distributors engaged in ongoing communications over several months about [a new low-cost distributor].   They shared information about market players' reactions to the new firm's entry, they collectively developed a response, and they provided reassurances to market participants about the collective response."

- "Benco and its competitor distributors (1) agreed to break with their traditional pattern and boycott the annual TDA meeting held in May 2014 because they perceived that [a new low-cost distributor] had positioned itself as a competitor to the traditional distributors, and (2) agreed to pressure other distributors and manufacturers to discontinue supplying [the new low-cost distributor] and/or end any relationships with manufacturers or

distributors that ultimately supplied [the new low-cost distributor] in order to stifle the competition provided by the new TDA offering."

- "Benco and its competitor distributors did not attend the annual TDA meeting, despite the economic gains Benco and other distributors historically derived from the event, not only from direct sales to conference attendees during the meeting, but also throughout the year through contacts and relationships fostered and developed at the meeting."

- "Benco and its competitor distributors contacted other distributors and manufacturers to pressure those entities to discontinue any relationships that ultimately supplied [the new low-cost distributor]."

- "As a result of this pressure, other distributors and manufacturers discontinued such relationships, causing [the new low-cost distributor] to lose access to products."

16.     Concurrent with the Texas AG's filing of the petition, the parties also filed a consent judgment, which obligated Defendant Benco to (i) pay $300,000 to reimburse the Texas AG's costs of the investigation, (ii) assist the Texas AG's ongoing investigation of other distributors, and (iii) agree to ongoing oversight by the Texas AG's office for three years.

17.     In 2014, the Arizona Attorney General ("Arizona AG") started investigating Benco and other as-yet-unknown Dental Supplies distributors for anticompetitive conduct in violation of Arizona law.   In October 2014, the Arizona AG issued Civil Investigative Demands ("CIDs") obligating Benco to produce documents and electronic data concerning the investigation, and Benco produced documents responsive to the CIDs.   That investigation is ongoing.

18.     Subsequent to the Texas and Arizona Attorneys General investigations, the FTC started investigating Benco and other unnamed Dental Supplies distributors.   That investigation is ongoing.

19.     In August 2012, a private antitrust action by Archer and White Sales, Inc. ("Archer"), a low-price distributor of Dental Supplies, was brought against certain Defendants in the U.S. District Court for the Eastern District of Texas.   That case is currently in arbitration.

20.     A separate private antitrust action by SourceOne against Defendants is currently pending in the U.S. District Court for the Eastern District of New York.

21.     Despite the aforementioned government investigations and private enforcement actions, Defendants' anticompetitive conduct and its ramifications have continued unabated.

**Dental Supply Market and Industry Characteristics**

22.     In the U.S., dental practitioners consistently buy and use a myriad of Dental Supplies as part of their practice.  Approximately 6% of a dental practitioner's annual income goes to the purchase of Dental Supplies.

23.     Typically, Dental Supply manufacturers sell their products to distributors such as Defendants, who then re-sell the Dental Supplies to dental practitioners.  Due to the various Dental Supplies needed by dental practitioners, they normally buy their Dental Supplies from distributors who offer a large selection of Dental Supplies from several different manufacturers, instead of ordering each Dental Supply from one or more of the many different manufacturers of Dental Supplies.  Distributors of Dental Supplies, such as Defendants, stock all, or most, of the Dental Supplies that a dental practitioner needs.  This allows a dental practitioner to buy all, or most, of their needed Dental Supplies from one distributor.  Dental practitioners typically pay a premium for this convenience.

24.     The premium Defendants have typically charged for supplying all or most of the Dental Supplies a dental practitioner needs has created an opportunity for additional distributors to enter the market and charge dental practitioners less for their Dental Supplies.  A new distributor could pay more for Dental Supplies from manufacturers and charge dental practitioners less for those same Dental Supplies and still be profitable.  A new distributor such as this would be beneficial to both manufacturers and dental practitioners.

25.     Nonetheless, due to Defendants' anticompetitive conduct as described herein, the Dental Supplies market is still highly concentrated, with high barriers to entry because of Defendants' anticompetitive conduct.  Combined, Defendants comprise over 80% of all U.S. sales of Dental Supplies.

26.     For a company to enter the U.S. Dental Supplies distributor market and achieve success, several things must fall into place.  The new distributor has to be able to supply dental practitioners a comparably extensive scope of Dental Supplies from the 300+ manufacturers of Dental Supplies.  The new distributor has to be able to buy Dental Supplies in big enough quantities and at low enough prices to compete with Defendants.  Finally, the new distributor has to be able to advertise itself and offer Dental Supplies to a great many dental practitioners.  To be successful, and be able to buy and stock the large amount of supplies necessary to achieve economies of scale that allow for lower prices, new distributors must be able to efficiently cultivate business relationships with large numbers of dental practices, laboratories, and manufacturers of Dental Supplies.

27.     One way for a new distributor to cultivate business relationships with dental practitioners is through endorsements or partnerships with state dental associations, which are voluntary associations of dentists.  State dental associations do not buy or sell Dental Supplies themselves; however, they can help to expedite the entry of new distributors by partnering with new distributors and endorsing the distribution platform for their members.  In so doing, state dental associations provide a critical gatekeeper role in validating new distributors.  However, state dental associations have been pressured by Defendants into not endorsing or partnering with new distributors.  Defendants apply pressure in the form of boycotts, such as Defendants' refusal to attend association trade shows or meetings, thereby preventing state dental associations from receiving a significant source of their income, which comes from distributors such as Defendants.

28.     For years, less expensive distributors have tried to enter the Dental Supplies market, with several state dental associations expressing interest in sponsoring, and partnering with, new distribution platforms in order to benefit their members.  However, new distributors have rarely been successful in partnering with or securing the endorsement of state dental associations due to Defendants' unlawful organized boycotts alleged herein.  Defendants have declined to do business with any new competitor in the Dental Supplies market, and have hindered other entities' efforts to do business with actual and potential rival distributors.  Any successful entry of a new competitor into the Dental Supplies distribution market, and the ensuing price discounts that would follow from increased competition, would considerably threaten Defendants' collective market share, revenues, and profits.  As further detailed below, Defendants reacted to the threat of new competitors by engaging in a conspiracy to boycott and threaten entities in order to prevent the successful entry of new competitors into the Dental Supplies distribution market.

29.     Defendants' commanding collective market power has enabled them to extensively foreclose the Dental Supplies market to potentially new distributors, thereby undermining competition, maintaining and enhancing market power, and enabling Defendants to charge Plaintiff and the other Class Members supra-competitive prices for Dental Supplies.

**Defendants Exert Market Power**

30.     Defendants' anticompetitive conduct and agreements comprise a horizontal group boycott that is a *per se* violation of Section 1 of the Sherman Act.  Therefore, a relevant market does not need to be defined.

31.     In the alternative, if the Court finds that Plaintiff's Sherman Act claim cannot advance under a *per se* theory, Defendants' anticompetitive conduct and agreements constitute a violation of the Sherman Act under the "rule of reason."  In this case, the relevant market, limited

geographically to the U.S., is the market for distributing and selling a wide range of Dental Supplies, including offering direct purchasers the convenience of buying from one distributor rather than from several manufacturers.

32.     As detailed below, there are hundreds of Dental Supply manufacturers, but most of the over 135,000 dental practices are small companies that do not have the ability to efficiently meet their Dental Supply requirements by separately buying from hundreds of different vendors.  Rather, direct purchasers of Dental Supplies depend on vendors like Defendants, who accumulate all or virtually all the Dental Supplies a dental practice would need.  Buying from one vendor offers enormous convenience to a dental practitioner.

33.     For direct purchasers, there are no adequate substitutes for distributors of a wide range of Dental Supplies. Even if individual manufactures sell supplies directly, they do not carry a wide range of supplies and it is not economically efficient for dental practitioners to buy from hundreds of different vendors.

34.     At all relevant times Defendants held market power—the capacity to profitably increase prices well above competitive levels while not losing sales—as evidenced by Defendants' abnormally high profit margins in what should be a tight market with low profit margins, if the market were competitive.

35.     A small but significant, non-transitory increase in price by Defendants would not have caused them to lose a meaningful amount of sales.

36.     Suppliers of one or a limited selection of Dental Supplies do not meaningfully limit Defendants' pricing power, and products sold by limited suppliers do not demonstrate significant positive cross-price elasticity of demand with regard to products sold by Defendants.

37.     Defendants sell Dental Supplies at prices significantly above marginal costs and the competitive price and therefore have benefited from artificially high profit margins, especially compared to distributors of other kinds of medical products, such as prescription pharmaceuticals.

38.     An alternative relevant market, limited geographically to the U.S., is the market for the distribution and sale of Dental Supplies.

39.     Defendants collectively have significant market power in all relevant markets.

40.     Defendants misused their dominant collective market power by secretly communicating and reaching an agreement to engage in an anticompetitive scheme to foreclose and hinder competition, maintain and increase market power, and artificially inflate prices of Dental Supplies above competitive levels.

**Defendants' Anticompetitive Conduct**

41.     In 2013, a recent Dental Supply distributor—SourceOne—created a distribution platform in partnership with the Texas Dental Association ("TDA"), aiming to offer many of the same products offered by Defendants, but at lower prices.  The resultant "TDA Perks Supplies" online sales platform permitted TDA members to purchase Dental Supplies from several different manufacturers.

42.     SourceOne contracted with several manufacturers to offer Dental Supplies to TDA members at prices that were significantly less than prices for similar products sold by Defendants. The TDA's endorsement permitted the new distributor to secure contracts with a significant number of Dental Supply manufacturers, which then permitted it to offer dental practices the convenience of buying from one vendor that was formerly only offered by distributors like Defendants.

43.     Inspired by the early success of the TDA website, SourceOne and other competitors aimed to partner with other state dental associations and national organizations to establish similar

distribution platforms. The nationwide proliferation of online distribution platforms would have significantly increased competition in the distribution market, culminating in lower prices for Dental Supplies for all direct purchasers such as Plaintiff and the other Class Members.

44.     Despite being direct competitors, Defendants communicated frequently with each other in order to develop a unified response to the danger posed by SourceOne and other new competitors.  For example, Defendants often communicated with each other using surreptitious methods to share competitively sensitive information, discuss boycotting strategies, and come to agreement on other anticompetitive matters.  Many of Defendants' employees formerly worked at another Defendant company.  These overlapping business and personal relationships aided the sharing of sensitive competitive information and facilitated Defendants' unlawful collusion.

45.     Responding to the danger of new competitors infiltrating the market, Defendants agreed with each another to hinder the success of new competitors through unlawful threats and boycotts of competitors, such as SourceOne, and entities that dealt with competitors.  Defendants' conspiracy included the following components, *inter alia*:

### 1.     Defendants Agreed to Compel Manufacturers to Stop Doing Business With Competitors

46.     Many Dental Supply manufacturers derive substantial percentages of their total sales from Defendants.  These manufacturers extensively depend on Defendants to advertise and re-sell their products to dental practitioners.  If Defendants were to cease selling products from one of these manufacturers, or if Defendants diminished their efforts to sell a manufacturer's products, that manufacturer would endure major financial losses.

47.     Defendants conspired to mutually compel and threaten manufacturers and other distributors to stop supplying new lower-priced distributors with Dental Supplies.  Also, Defendants

warned manufacturers that if they did business with a new lower-priced distributor, Defendants would not sell or actively advertise that manufacturer's Dental Supplies.

48.     Because Defendants together hold a commanding share of the Dental Supplies market, and because many manufacturers depend on Defendants for a significant percentage of their sales revenue and income, these warnings succeeded in intimidating manufacturers to stop doing business with low-priced distributors such as SourceOne.

49.     Significantly, the relatively few manufacturers who were not reliant on Defendants for a large percentage of their revenues did not stop doing business with Defendants' competitors such as SourceOne, for the most part.  These manufacturers were not as impacted by Defendants' boycotts and warnings because their profitability did not depend on sales to Defendants.

50.     In a competitive market, a single distributor's boycott of a Dental Supplies manufacturer would go against that distributor's independent self-interest.  A dental practitioner wanting to buy products from the boycotted manufacturer would just buy the products from a competing distributor.  As a result, that competing distributor would gain market share and profits at the expense of the distributor independently boycotting the manufacturer.  Thus, a manufacturer boycott of the type alleged in this case would only happen, and only makes economic sense, if those distributors participating in the manufacturer boycott were doing so together, and by agreement. Had Defendants not been acting pursuant to a conspiracy, it would not have made economic sense for any one individual Defendant to boycott Dental Supply manufacturers.

### 2.     Defendants Agreed to Compel State Dental Associations to Stop Doing Business With Competitor Distributors, and to Boycott State Dental Associations That Endorsed, or Partnered With, Competitor Distributors

51.     Dental Supply distributors, including Defendants, routinely attend and participate in state dental association trade shows and annual meetings.  State dental associations rely on the

12

attendance of Dental Supply distributors at their annual expositions—especially dominant distributors like Defendants—because revenues from these shows make up a large percentage of the dental associations' annual incomes.

52.     Defendants entered into a conspiracy to boycott the yearly trade shows and meetings of state dental associations which did or were considering doing business with Defendants' competitors, such as SourceOne.   As part of the conspiracy alleged herein, Defendants also compelled Dental Supply manufacturers and other distributors to join these boycotts.

53.     In furtherance of its conspiracy, Defendants threatened to boycott the annual meetings and trade shows of the TDA, the Arizona Dental Association ("ADA"), and the Louisiana Dental Association ("LDA").   Defendants not only threatened, but carried out its threat by boycotting the annual meetings and trade shows of the TDA and the ADA.   The LDA had planned to endorse SourceOne's online platform, but due to Defendants' threatened boycotts, the LDA decided not to endorse SourceOne's online platform after all.

54.     Knowing of Defendants' successful boycotts of the TDA and ADA, other state dental associations were discouraged from partnering with or endorsing new distributors.

55.     Defendants' boycotts of state dental associations that did business with new, disruptive distributors sent a strong message to state dental associations across the U.S.  State dental associations, including the LDA, discarded plans to endorse or partner with competitors and were discouraged from doing business with those new competitors.

56.     In a competitive market, a single distributor's independent boycott of a state dental association annual meeting or trade show would go against that distributor's self-interest.  Attending trade shows allows a distributor to promote its brand and advertise its services to thousands of state dental association members.  Oftentimes, distributors that withdrew from trade shows to boycott a

state dental association lost large security deposits. Therefore, had Defendants not been acting as part of a conspiracy, it would not have made economic sense for any individual Defendant to independently boycott state dental association trade shows.

**Defendants Continuously Engage in Anticompetitive Conduct**

57.     Defendants have engaged in other combined anticompetitive conduct against Dental Supply distributors for several years.

58.     For instance, in 2012, Archer and White Sales, Inc. ("Archer"), a low-price distributor of Dental Supplies, filed an antitrust case claiming that certain Defendants engaged in anticompetitive conduct including:

(i) conspiring to impede Archer's growth in certain parts of the country;

(ii) engaging in a conspiracy to fix prices by agreeing not to competitively bid against horizontal competitors;

(iii) blocking Archer's membership in the American Dental Cooperative, an organization designed to help smaller companies compete against large national Dental Supply distributors; and

(iv) coordinating boycotts against Archer by threatening to stop purchasing equipment from certain suppliers and to stop selling equipment from certain manufacturers.

**The U.S. Dental Supply Distribution Market Is Highly Vulnerable to an Anticompetitive Conspiracy**

59.     The U.S. Dental Supply distribution market has a number of attributes that increase its vulnerability to anticompetitive conspiracy among Dental Supply distributors. These attributes—including high concentration among companies in the market, barriers to entry caused by Defendants' anticompetitive conduct, stable or constant demand, and a history of antitrust inquiry—reveal the possibility for successful collusion among Dental Supply distributors.

14

### 1. The Market for Dental Supplies Is Highly Concentrated

60.     Defendants' collective market share has steadily increased over the last five years. Together, Defendants constitute over 80% of the Dental Supplies market.

61.     While Defendants are nationwide distributors of Dental Supplies, the majority of the other distributors are regional.  Due to the Defendants' actions alleged herein, competitors' efforts to expand have been thwarted and they have not been able to establish a nationwide foothold that could force Defendants to reduce prices.

62.     The Herfindahl-Hirschman Index ("HHI") measures industry concentration. According to the U.S. Department of Justice ("DOJ"), "[t]he HHI is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers." Economists frequently use the HHI to quantify how concentrated a particular market is.  The DOJ considers an industry with an HHI value higher than 2,500 to be "highly concentrated".  In the market for Dental Supplies, the HHI is above 3,000, highly concentrated by DOJ standards.

63.     A highly concentrated market makes it easier for distributors to align their behavior and makes it more burdensome for direct purchasers to circumvent the negative effects of collusive behavior.

### 2. The Market for Dental Supplies Has High Barriers to Entry

64.     High barriers to entry caused by Defendants' anticompetitive conduct increase the probability that distributors can successfully conspire to further increase barriers to entry, thereby impeding the capacity of new low-cost Dental Supply distributors to enter the market.

65.     The Dental Supplies market has certain characteristics—such as the importance of state dental associations to the success or failure of new distributors, and the market power

Defendants maintain over the manufacturers that make manufacturers exceptionally dependent upon the Defendants—which combine to make the market vulnerable to a Defendant-driven group boycott.

66.     These barriers to entry increase the market's vulnerability to an aligned attempt by the biggest distributors in the market to maintain supra-competitive prices.

### 3. Aggregate Demand is Relatively Constant

67.     In a competitive market, companies confronted with static or declining demand conditions will try to increase sales by decreasing prices in order to take market share from competitors.  Because of this, companies confronted with static or declining demand have a greater incentive to collude in order to circumvent price competition.  Rising or stagnant prices and high profit margins with constant or decreasing demand are at odds with a competitive market.

68.     While aggregate demand among buyers of Dental Supplies has been relatively constant over the last eight years, Defendants have regularly increased their prices in this time period.

69.     Approximately 75% of all Dental Supply sales are made through distributors, and single-dentist dental practices comprise the vast majority of purchases.  Because most dental practitioners are unable to spend the time and effort necessary to buy all of their Dental Supplies directly from hundreds of different manufacturers, distributors like Defendants can re-sell Dental Supplies at large profit margins.

70.     Because demand for Dental Supplies is directly related to the demand for dental services, and many privately-insured individuals get routine dental care coverage, demand for Dental Supplies among dental practices is quite consistent.

71.     Defendants Henry Schein and Patterson have increased prices for Dental Supplies each year since 2005, despite the 2009 economic recession that caused demand for Dental Supplies to decrease by over 2%.

72.     Defendants run highly profitable enterprises.  Defendant Patterson, for instance, had roughly 11% profit margins in 2010 and 2011, much higher than profit margins among distributors in other health care product markets.  For instance, profit margins for the "big three" pharmaceutical distributors in the U.S. (AmerisourceBergen, Cardinal Health, and McKesson) commonly hover between 0.2 and 1.5%.  The most recent public data for the "big three" shows quarterly profit margins between 1.03 and 1.37%.

73.     Increasing prices when demand is decreasing reflects an industry in which sellers are conspiring to wield market power.  The Dental Supplies distribution industry has experienced regularly increasing prices while demand has either decreased or stayed the same.

**Harm to Competition Due to Defendants' Conspiracy**

74.     The anticompetitive conduct described in this Complaint maintained and increased Defendants' combined market power, allowing Defendants to maintain prices above competitive levels, to the harm of Plaintiff and the other Class Members.  This detriment to Plaintiff and the other Class Members, in the form of paying artificially inflated prices for Dental Supplies, comprises obvious antitrust injury and harm to competition under the antitrust laws.  To the extent relevant, the anticompetitive actions alleged in this Complaint had other competitive harms also.  As a result of the successful boycotts of new entrants, other potential competitors were discouraged from partnering with manufacturers and/or state dental associations to compete with Defendants.

75.     In addition to the artificially inflated prices charged to Plaintiff and the other Class Members, the anticompetitive effects of Defendants' conspiracy alleged herein include, *inter alia*,

17

reduced competition in the Dental Supplies distribution market, reduced consumer choice, and harm to consumer welfare in general.

76.    There are no valid procompetitive justifications for the anticompetitive conduct alleged in this Complaint, or for any aspect of Defendants' conspiracy standing alone, and even if there were, there are less restrictive means of achieving those purported procompetitive effects.  To the extent that Defendants' anticompetitive conduct or any form of their conspiracy has any detectable procompetitive effects, they are greatly outweighed by the anticompetitive effects.

**Antitrust Injuries to Plaintiff and the Other Class Members**

77.    During the Class Period, Plaintiff and the other Class Members purchased Dental Supplies from Defendants. As a result of Defendants' anticompetitive conduct alleged herein, Plaintiff and the other Class Members paid Defendants supra-competitive prices for Dental Supplies during and throughout the Class Period.

78.    If new low-cost distributors had not been unlawfully blocked from partnering with state dental associations and/or Dental Supply manufacturers, they would have become meaningful competitors to Defendants, bringing about greater competition and much lower prices for Dental Supplies, and Plaintiff and the other Class Members would have paid much less for Dental Supplies during and throughout the Class Period.

79.    If Defendants had not unlawfully conspired to block new low-cost distributors from partnering with state dental associations and/or Dental Supply manufacturers, other competitors would have partnered with state dental associations and manufacturers and become viable nationwide competitors to Defendants, bringing about greater competition and much lower prices for Dental Supplies, and Plaintiff and the other Class Members would have paid much less for Dental Supplies during and throughout the Class Period as a result.

80.     Because Defendants succeeded in unlawfully blocking new low-cost distributors and other competitors from partnering with state dental associations and Dental Supply manufacturers to compete with Defendants, competition in the market was substantially harmed, and Plaintiff and the other Class Members have sustained, and continue to sustain, significant losses in the form of artificially inflated prices paid to Defendants.  The full amount of such damages will be calculated after discovery and upon proof at trial.

81.     Injury to Plaintiff and the other Class Members was a direct and foreseeable result of Defendants' anticompetitive conduct.  Defendants' group boycotts blocked new entrant competitors, thereby quashing competition, increasing Defendants' market power, and allowing Defendants to charge artificially inflated prices for Dental Supplies to dental practitioners.  Although the device of antitrust injury to Plaintiff and to Defendants' competitors is the same, the damages caused to Plaintiff and the other Class Members in the form of artificially inflated higher prices is separate from, and not duplicative of, the damages caused to Defendants' competitors in the form of lost profits and business opportunities.

82.     Defendants' anticompetitive conduct is ongoing, as are the overcharges suffered by Plaintiff and the other Class Members caused by Defendants' conduct.

## CLASS ALLEGATIONS

83.     Pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3), Plaintiff brings this action on behalf of the Class, defined as follows: All persons and entities in the United States who directly purchased one or more Dental Supplies from one or more Defendants, from January 20, 2012 to the present (the "Class Period").

84.     Excluded from the Class are Defendants and their officers, directors, management, employees, subsidiaries, or affiliates, and all federal governmental entities.

85.     Members of the Class are so numerous that joinder is impracticable. Plaintiff believes that there are hundreds, if not thousands, of Class Members.  Furthermore, the Class is readily identifiable from information and records maintained by Defendants.

86.     Plaintiff's claims are typical of the claims of the Class Members.  Plaintiff and Class Members were damaged by the same wrongful conduct of defendants.

87.     Plaintiff will fairly and adequately protect and represent the interests of the Class. The interests of the Plaintiff are coincident with, and not antagonistic to, those of the Class.

88.     Plaintiff is represented by counsel who are experienced and competent in the prosecution of class action litigation, and who have particular experience with class action litigation involving alleged violations of antitrust law.

89.     Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class Members because defendants have acted on grounds generally applicable to the entire Class, thereby determining damages with respect to the Class as a whole is appropriate.  Such generally applicable conduct is inherent in defendants' wrongful conduct.

90.     Questions of law and fact common to the Class include:

(a)  whether Defendants engaged in a conspiracy to group boycott entities that did business with defendants' competitors or threatened to boycott entities that did business with defendants' competitors;

(b)  whether Defendants engaged in a conspiracy to group boycott Defendants' competitors or threatened to boycott Defendants' competitors;

(c)  the duration and extent of the alleged conspiracy;

(d)  the effect of the conspiracy on the prices of Dental Supplies sold in the United States during the Class Period;

(e)  whether the alleged conspiracy violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

(f)  the nature and extent of damages and injunctive relief to which Plaintiff and the Class Members are entitled; and

(g)  whether Plaintiff and the Class Members should be awarded attorneys' fees and costs.

91.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Such treatment will allow a large number of similarly-situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would require.  The benefits of proceeding as a class action, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh potential difficulties in the management of this class action.  Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## CLAIM FOR RELIEF
## VIOLATION OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1

92.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

93.    As set forth above, in violation of Section 1 of the Sherman Act, Defendants agreed and conspired with one another to boycott and threaten to boycott state dental associations, Dental Supply distributors, and Dental Supply manufacturers that were doing business or thinking about doing business with new low-cost distributors and other competitors.  This conspiracy was a *per se* unlawful group boycott or, alternatively, an unlawful restraint under the rule of reason.

21

94.     Each Defendant has committed at least one overt act—such as boycotting and/or threatening to boycott companies that did business or thought about doing business with competitors—in furtherance of the conspiracy alleged herein.

95.     Plaintiff and the other Class Members have been injured in their business or property by Defendants' antitrust violations.  The injury to Plaintiff and the other Class Members consists of paying supra-competitive prices for Dental Supplies.  Such injury, in the form of overcharges, is the kind of injury that antitrust laws were made to prevent, and emanates directly from Defendants' unlawful conduct.

## PRAYER FOR RELIEF

96.     WHEREFORE, Plaintiff, individually and on behalf of the other Class Members, prays that the Court:

1) Determine that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23, and direct that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23, be given to the Class, and appoint Plaintiff as Class representative and its counsel of record as Class counsel;

2) Grant permanent injunctive relief which enjoins Defendants from violating the antitrust laws by entering into and carrying out their illegal agreements, and requires Defendants to take affirmative steps to dissipate the effects of the violation;

3)  Adjudge and decree that the acts alleged herein are unlawful restraints of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

4)  Enter joint and several judgments against Defendants and in favor of Plaintiff and the Class;

5)   Award damages sustained by Plaintiff and the Class, and any additional damages, penalties, and other monetary relief provided by applicable law, including treble damages;

6)   Award Plaintiff and the Class pre-judgment and post-judgment interest as provided by law, and decree that such interest be awarded at the highest legal rate from and after the date of service of the complaint in this action;

7)   Award Plaintiff and the Class their costs of this suit, including reasonable attorneys' fees; and

8)   Award such other and further relief as the Court deems just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff, on behalf of himself and all other similarly situated, hereby requests a jury trial, pursuant to Federal Rule of Civil Procedure 38, on any and all claims so triable.


Dated: February 23, 2016                          **GLANCY PRONGAY & MURRAY LLP**


                                                  By:_____
                                                  Brian Murray
                                                  Lee Albert (*pro hac pending*)
                                                  Thomas J. Kennedy
                                                  122 East 42nd Street, Suite 2920
                                                  New York, NY 10168
                                                  Telephone: (212) 682-5340
                                                  Facsimile: (212) 884-0988
                                                  Email: bmurray@glancylaw.com
                                                          lalbert@glancylaw.com
                                                          tkennedy@glancylaw.com

                                                  **LAW OFFICE OF PAUL C. WHALEN, P.C.**
                                                  Paul C. Whalen
                                                  768 Plandome Road
                                                  Manhasset, NY  11030
                                                  Telephone: (516) 426-6870
                                                  Email: paul@paulwhalen.com