Colin R. Kass (admitted *pro hac vice*)
Scott M. Abeles (admitted *pro hac vice*)
Stephen R. Chuk
PROSKAUER ROSE, LLP
1001 Pennsylvania Ave., NW
Washington, DC 20004
Telephone:  202-416-6800
ckass@proskauer.com
sabeles@proskauer.com
schuk@proskauer.com

Bradley I. Ruskin
David A. Munkittrick
PROSKAUER ROSE, LLP
Eleven Times Square
New York, NY 10036
Telephone: 212-969-3226
bruskin@proskauer.com
dmunkittrick@proskauer.com

*Counsel for Defendant Henry Schein, Inc.*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                            :
In re DENTAL SUPPLIES                        :   **DEFENDANT HENRY SCHEIN, INC.'S**
ANTITRUST LITIGATION                         :   **MEMORANDUM OF LAW**
                                            :   **IN SUPPORT OF ITS MOTION TO**
                                            :   **DISMISS THE CONSOLIDATED**
                                            :   <u>**CLASS ACTION COMPLAINT**</u>
                                            :
                                            :
                                            :   16 Civ. 696 (BMC)
                                            :
                                            :   **ALL CASES**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## <u>TABLE OF CONTENTS</u>

I.  INTRODUCTION ......................................................................................................... 1

II.  THE COMPLAINT DOES NOT PLAUSIBLY ALLEGE A SINGLE, OVERARCHING CONSPIRACY. ...................................................................... 4

    A.  The Complaint Does Not Plausibly Allege a Conspiracy Among Benco, Patterson, and Schein to Fix Prices. ........................................................... 6

    B.  The Complaint Does Not Plausibly Allege an Agreement Among Benco, Patterson, and Schein to Allocate Customers. ...................................... 11

    C.  The Complaint Does Not Plausibly Allege an Agreement Among Benco, Patterson, and Schein to Boycott (or Threaten to Boycott) Manufacturers, Trade Associations, or Dentists that Deal with Discounters. ............................... 13

    D.  The Complaint Does Not Plausibly Allege a Conspiracy Among Schein and Burkhart. ............................................................................................ 19

III.  THE COURT IS EMPOWERED TO DISMISS THE CASE OR LIMIT IT TO THE SOURCEONE TRADE-SHOW ATTENDANCE ALLEGATIONS. ...................... 20

IV.  CONCLUSION ........................................................................................................... 24

# TABLE OF AUTHORITIES[1]

CASES                                                                                      PAGES

*Anderson News, L.L.C. v. American Media, Inc.*,
   680 F.3d 162 (2d Cir. 2012).......................................................................................... 8

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)..............................................................................................*passim*

*Bradford v. N.Y. Times Co.*,
   501 F.2d 51 (2d Cir. 1974)............................................................................................ 12

*Briggs & Stratton Corp. v. Kohler Co.*,
   405 F. Supp. 2d 986 (W.D. Wis. 2005) ........................................................................ 22

*Estee Lauder, Inc. v. Fragrance Counter, Inc.*,
   189 F.R.D. 269 (S.D.N.Y. 1999) .................................................................................. 22

*Geneva Pharm. Tech. Corp. v. Barr Labs Inc.*,
   386 F.3d 485 (2d Cir. 2004).......................................................................................... 14

*Giles v. Phelan, Hallinan & Schmieg*,
   901 F Supp. 2d 509 (D.N.J. 2012) ............................................................................... 23

*H.L. Hayden Co. of New York, Inc. v. Siemens Medical Systems, Inc.*,
   879 F.2d 1005 (2d Cir. 1989)........................................................................................ 18

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*,
   602 F.3d 237 (3d Cir. 2010)............................................................................................ 5

*In re Actos End Payor Antitrust Litig.*,
   2015 WL 5610752 (S.D.N.Y. 2015) .............................................................................. 5

*In re Air Cargo Shipping Services Antitrust Litigation*,
   2014 WL 7882100 (E.D.N.Y. 2014).............................................................................. 21

*In re Apple REITs Litig.*,
   2015 WL 1345328 (E.D.N.Y. 2015) ............................................................................... 6

*In re Baby Food Antitrust Litig.*,
   166 F.3d 112 (3d Cir. 1999)......................................................................................... 8, 9

---

[1] Unless otherwise noted, all emphasis added and internal citations and quotation marks omitted.

*In re Chocolate Confectionary Antitrust Litig.*,
    801 F.3d 383 (3d Cir. 2015).................................................................. 7

*In re Credit Default Swaps Antitrust Litig.*,
    2014 WL 4379112 (S.D.N.Y. 2014)...................................................... 21

*In re Elevator Antitrust Litig.*,
    502 F.3d 47 (2d Cir. 2007).................................................................. 7, 9

*In re Florida Cement & Concrete Antitrust Litig.*,
    746 F. Supp. 2d 1291 (S.D. Fla. 2010) ........................................... *passim*

*In re High–Tech Employee Antitrust Litig.*,
    856 F. Supp.2d 1103 (N.D. Cal. 2012) ................................................ 12

*In re Iowa Ready-Mix Concrete Antitrust Litig.*,
    768 F. Supp. 2d 961 (N.D. Iowa 2011)............................................... 4, 20

*In re Lithium Ion Batteries Antitrust Litigation*,
    2014 WL 309192 (N.D. Cal. 2014) ...................................................... 21

*In re Livent, Inc. Secs. Litig.*,
    148 F. Supp. 2d 331 (S.D.N.Y. 2001)................................................... 6

*In re Merrill Lynch & Co., Inc. Research Reports Secs Litig.*,
    218 F.R.D. 76 (S.D.N.Y. 2003) ........................................................... 23

*In re Musical Instruments &Equip. Antitrust Litig.*,
    798 F.3d 1186 (9th Cir. 2015) ............................................................. 17

*In re Optical Disk Drive Antitrust Litig.*,
    2011 WL 3894376 (N.D. Cal. 2011) .................................................. 5, 20

*In re Polyurethane Foam Antitrust Litigation*,
    2015 WL 520930 (N.D. Ohio 2015)...................................................... 6

*In re Zinc Antitrust Litig.*,
    2016 WL 93864 (S.D.N.Y. 2016)......................................................... 2

*LaFlamme v. Societe Air France*,
    702 F. Supp. 2d 136 (E.D.N.Y. 2010) ................................................. 15

*Lipsky v. Commw. United Corp.*,
    551 F.2d 887 (2d Cir. 1976)................................................................. 23

*Low v. Robb*,
    2012 WL 173472 (S.D.N.Y. 2012) ..................................................... 23

*Masco Contractor Servs. v. Beals*,
    279 F. Supp. 2d 699 (E.D. Va. 2003) ................................................. 5

*Mayor & City Council of Balt., Md. v. Citigroup, Inc.*,
    709 F.3d 129 (2d Cir. 2013) ............................................... 10, 14, 16

*McCarn v. HSBC USA, Inc.*,
    2012 WL 7018363 (E.D. Cal. 2012) .................................................. 5

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
    465 U.S. 752 (1984) ....................................................................... 15

*Mylan Labs., Inc. v. Akzo, N.V.*,
    770 F. Supp. 1053 (D. Md. 1991) .................................................. 1, 5

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*,
    998 F.2d 1224 (3d Cir. 1993) ........................................................... 7

*Precision Associates, Inc. v. Panalpina World Transp. (Holding) Ltd.*,
    2011 WL 7053807 (E.D.N.Y. 2011) ........................................ 2, 4, 22

*Precision Associates, Inc. v. Panalpina World Transp. (Holding) Ltd.*,
    2012 WL 3307486 (E.D.N.Y. 2012) ................................................. 2

*Reiter's Beer Distributors, Inc. v. Christian Schmidt Brewing Co.*,
    657 F. Supp. 136 (E.D.N.Y. 1987) ................................................ 22

*Ross v. Am. Express. Co.*,
    35 F. Supp. 3d 407 (S.D.N.Y. 2014) ............................................ 9, 18

*Simon v. Mfrs. Hanover Trust Co.*,
    849 F. Supp. 880 (S.D.N.Y. 1994) ............................................... 22

*Starr v. Sony BMG Music Entm't*,
    592 F.3d 314 (2d  Cir. 2010) ........................................................ 18

*Uhr v. Responsible Hosp. Inst., Inc.*,
    2011 WL 4091866 (D. Minn. 2011) ................................................ 5

*Ulrich v. Moody's Corp.*,
    2014 WL 4977562 (S.D.N.Y. 2014) .............................................. 12

*Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*,
    513 F. Supp. 1100 (E.D. Pa. 1981) ........................................................................... 4

**OTHER AUTHORITIES**
Areeda & Hovenkamp,
    *Antitrust Law* ¶ 1429 (2nd ed. 2000) ........................................................................ 17

Wright & Miller,
    5C Fed. Prac. & Proc. Civ., § 1380 (3d ed.) ........................................................... 23

Wright & Miller,
    6A Fed. Prac. & Proc. Civ. § 1529 (3d ed.) ............................................................ 23

**RULES**
Fed. R. Civ. P. 12 ......................................................................................... *passim*

Fed. R. Civ. P. 56 ................................................................................................ 21

Fed. R. Civ. P. 16 ...................................................................................... 4, 23, 24

## I.      INTRODUCTION

Plaintiffs stitch together allegations from two separate claims involving separate Defendants, actors, time periods, locations, and conduct.  They then declare that this constitutes a "single interconnected conspiracy."   P. Ltr. 2 (ECF 52).   But these two claims – neither adjudicated – have nothing in common, except that both involved the sale of dental supplies and *one* Defendant appears in both.  Plaintiffs, of course, need to cobble these cases together in order to sustain a broad, nationwide class.   But only speculation weaves the disparate anecdotes alleged into an overarching, multi-faceted, eight-year conspiracy.   This patchwork does not satisfy *Twombly*.

The Complaint asserts an "*overarching* agreement not to compete on price" between "Henry Schein, Patterson, Benco, and [non-defendant] Burkhart."  Cmplt. ¶ 3 (ECF 49).  It then contends that this "overarching agreement" had three "interrelated components" of wrongful conduct:  (i) an agreement to "fix margins on dental supplies and equipment;" (ii) a "customer allocation agreement," and (iii) group boycotts (or threatened boycotts) of manufacturers, dental associations, and dentists that support rival distributors.   *Id*. ¶¶ 3-6.   Most importantly, the Complaint declares that "***each Defendant***" participated in "***all aspects*** of the overarching" conspiracy.  P. Ltr. 2 (italics in original); Cmplt. ¶¶ 4-6.

Plaintiffs are obligated to plead facts, which "*if proved at trial*, would be sufficient to permit the inference" of an overarching agreement to fix prices, allocate customers, and boycott rivals.  *Mylan Labs., Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1067 (D. Md. 1991) (dismissing overarching conspiracy).   Yet no fair reading of the Complaint supports an overarching conspiracy, or that "each defendant" participated in every "aspect" of it.  There is no direct evidence of any overarching agreement, or direct allegations connecting the "components" through space or time.  Thus, there is no basis to infer a vast, unitary conspiracy.  *Precision*

*Associates, Inc. v. Panalpina World Transp. (Holding) Ltd.*, 2011 WL 7053807, *28 (E.D.N.Y. 2011) (allegations that "defendants were involved in multiple conspiracies at different times in different regions" failed to state claim for a "single, common" conspiracy), *recommendation adopted,* 2012 WL 3307486 (E.D.N.Y. 2012).

The first component, "margin fixing," stems *exclusively* from allegations made by Archer & White ("A&W") in a 2012 competitor suit against Henry Schein, Inc. ("Schein"), Burkhart Dental Supply Co., Inc. ("Burkhart"), and various manufacturers.  Neither Benco Dental Supply Company ("Benco") nor Patterson Companies, Inc. ("Patterson") was named, or even mentioned, in A&W's complaint.  Not surprisingly, the class Complaint likewise lacks *factual* allegations implicating Benco or Patterson in margin fixing, much less in any way connecting Schein to those competitors. Plaintiffs resort instead to liberal sprinklings of vague and conclusory words – like "defendants" or "cartels members" or "jointly" or "collectively" – to create a contrary impression.  But artful "group pleading" is no substitute for plausible conspiracy allegations.  *See* Mar. 23, 2016 Hrg. Tr. at 10 (THE COURT: "[T]o the extent there is group pleading . . . that is not what I consider to be factual in terms of assessing that ultimate level of facts that *Twombly* requires."); *In re Zinc Antitrust Litig.*, 2016 WL 93864, *32 (S.D.N.Y. 2016) (noting that plaintiffs should be "admonished" for "resorting to . . . group pleading.").

The second component, "customer allocation," is equally defective.  There are no direct allegations of such an agreement.  Instead, based on a single email, Plaintiffs allege that Benco and Schein (but not Patterson or non-Defendant Burkhart) agreed not to "poach" each other's employees.  But an *employee* no-poach agreement is not the same as a *customer* allocation agreement.  The former affects the labor market; the latter affects the retail *goods* market.  So

even if those allegations had merit, they would not support a conspiracy to allocate customers, let alone one to fix prices.  Were it otherwise, every "no-poach" agreement would trigger the automatic filing of an ancillary price-fixing claim.  No case supports such a sweeping expansion of pleading practice.

The third component, horizontal "boycotts" of manufacturers, also stems almost entirely from A&W's complaint which, again, did *not* involve Patterson or Benco.  This story contains *no* joint communications among any two of the Defendants, let alone all three.  There are, in fact, no factual allegations of any **horizontal** boycott.  Instead, Plaintiffs take **vertical** boycott allegations and, through artful group pleading, try to twist them into a **horizontal** conspiracy.

These efforts crater quickly.  It is perfectly natural for a distributor to go "up the chain" to complain to manufacturers about its rivals.  Such complaints do not require – or even imply – any pre-existing agreement among competing distributors, and Plaintiffs' speculation to the contrary contradicts everyday experience.  *Twombly* itself involved exactly this type of boycott allegation, and the Supreme Court rejected it.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 566 (2007) (there is "no reason to infer that the companies had agreed among themselves to do what was only natural anyway").

In the end, neither the overarching conspiracy nor its core components are well pled. The question then is what the Court should do about that.  Plaintiffs argue that, even if their overarching conspiracy claim fails, this Court is powerless to do anything about it.  P. Ltr., 2. That is wrong.  The Court can, and should, dismiss the entire Complaint under Rule 12(b)(6), because the theory on which it is grounded is pure speculation.  Though a lengthy line of cases supports complete dismissal – even when *portions* of a Complaint are deemed well-pled – the Court may, in the alternative, limit the Complaint to the portion that Schein does not address in

this motion – SourceOne's trade show allegations – and dismiss the remainder.  Or it may limit the Complaint to the trade show allegations by striking the rest under Rule 12(f).  Finally, the Court may jettison the implausible allegations under its Rule 16 authority to "simplify[] the issues" and "eliminate frivolous" claims.

## II.     THE COMPLAINT DOES NOT PLAUSIBLY ALLEGE A SINGLE, OVERARCHING CONSPIRACY.

Plaintiffs throw a number of anecdotes into a pot, mix it up, and claim to have conjured a single, eight year, nationwide conspiracy to fix prices. They could have instead alleged separate counts for each anecdote or type of alleged agreement, and we could have litigated the scope and legality of each, the identity of the dentists impacted by each one, and which Defendants, if any, ought to be held liable.  Instead, they made a choice – to "go big" and assert a single overarching conspiracy. But that choice has consequences.  And the consequence of overreaching here is dismissal of the entire Complaint.

"Merely intoning the magic words unitary conspiracy" is not enough to plausibly allege one.  *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 513 F. Supp. 1100, 1310-11 (E.D. Pa. 1981);  *Precision Assocs.,* 2011 WL 7053807, at *29 ("While there are some overlapping parties in the conspiracy, there are no allegations in the Complaint that lead to the conclusion that the various local conspiracies were formulated pursuant to an overarching scheme to raise prices generally."); *In re Iowa Ready-Mix Concrete Antitrust Litig.*, 768 F. Supp. 2d 961, 975 (N.D. Iowa 2011) ("What is missing in this case . . . is the 'larger picture' from which inferences of a wider conspiracy can be drawn from guilty pleas to separate bilateral conspiracies.").  In short, stringing together allegations and stamping them "Unitary Conspiracy" is "a far cry from

4

establishing plausibility for" such a conspiracy.  *In re Optical Disk Drive Antitrust Litig.*, 2011 WL 3894376, *9 (N.D. Cal. 2011).[2]

Here, Plaintiffs have not alleged any direct evidence of an overarching conspiracy, such as *any* meetings among all the Defendants to advance their grand conspiracy.  In fact, they do not even allege facts showing that each Defendant engaged in each aspect of the alleged conspiracy.  For example, they allege no facts showing that Patterson or Burkhart participated in the alleged customer allocation agreement; no facts showing that Patterson and Benco participated in the alleged price-fixing conspiracy; and no facts reflecting any joint communications concerning the alleged boycotts of manufacturers that supplied A&W.

Nor does the "in for a penny, in for a pound" principle – in which a conspiracy may be cognizable even if certain defendants play only a small role in it – apply.  Plaintiffs do not contend that each Defendant played a specialized role in the scheme.  This is not a case, for example, in which one firm obtains the supplies, another arranges the transportation to and from the scene, and a third handles the spoils.  In such cases, each participant must do its part for the scheme to work.  And where there is such a division of labor, the law does not require that each

---

[2] *See also In re Actos End Payor Antitrust Litig.*, 2015 WL 5610752, *26 (S.D.N.Y. 2015) (Plaintiffs' "overarching conspiracy claim . . . lack[ed] sufficient factual support" because the complaint merely detailed bilateral agreements rather than coordinated action by all the defendants); *McCarn v. HSBC USA, Inc.*, 2012 WL 7018363, *6 (E.D. Cal. 2012) (dismissing claim of single, overarching conspiracy and noting that "the simple fact the industry is insular does not automatically transform multiple, parallel schemes into one unitary conspiracy"); *Uhr v. Responsible Hosp. Inst., Inc.*, 2011 WL 4091866, *10-11 (D. Minn. 2011) (dismissing antitrust claims, noting that "connections between people involved in the various alleged local conspiracies does not mean that the local conspiracies are part of a single nationwide conspiracy"); *In re Florida Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d 1291, 1319 (S.D. Fla. 2010) (although complaint supported a conspiracy, complaint did not "plausibly support the entire statewide, ten-Defendant, two-product conspiracy alleged by Plaintiffs," but "support[ed] something more modest" and limited claims to specific allegations in the complaint); *Mylan Labs.*, 770 F. Supp. at 1066 (dismissing global conspiracy claim and holding that "[m]ere identity of purpose, interconnected events and shared participants . . . do not link separate conspiracies into one overall, single conspiracy"); *cf. Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 255 (3d Cir. 2010) (affirming dismissal of overarching hub-and-spoke conspiracy; "rim" was missing because Plaintiffs could not plausibly suggest a unity of purpose between defendant and its dealers); *Masco Contractor Servs. v. Beals*, 279 F. Supp. 2d 699, 705 (E.D. Va. 2003) (dismissing Section 1 claims and holding that "in the absence of any allegations of agreements between 'spokes,' a single 'rimless wheel' conspiracy must be evaluated as several individual conspiracies").

defendant have a hand in each facet of it to state a claim against all three. But Plaintiffs do not allege a conspiracy in which Benco played one role, Patterson another, and Schein a third.[3]

Plaintiffs assert instead an "overarching conspiracy" in which "**each Defendant** is implicated in **all** aspects" of it. P. Ltr., 2. This is a critical distinction inherent in the type of conspiracy alleged. Unlike the division of labor example, if the evidence here showed, for example, that Benco did not fix prices, it could not be liable for price fixing. It would not matter what the evidence showed about its attendance at various trade-shows, its hiring practices, or its dealings with various manufacturers. Plaintiffs offer nothing but speculation that a conspiracy would be more successful if each Defendant participated in each of its components. Thus, Plaintiffs' hook into a unitary conspiracy – that "each defendant is implicated in **all** aspects of the overarching agreement" – is not a throw-away line, but a **critical** fact that Plaintiffs must plausibly plead. They have not done so.

A.     <u>**The Complaint Does Not Plausibly Allege a Conspiracy Among Benco, Patterson, and Schein to Fix Prices.**</u>

Described as the "core of the conspiracy," the price-fixing allegations stem *entirely* from allegations in a 2012 complaint filed by A&W.[4] *See* Cmplt. ¶¶ 44-73. A&W's complaint does

---

[3] *In re Polyurethane Foam Antitrust Litigation*, 2015 WL 520930, *24 (N.D. Ohio 2015), cited by Plaintiffs in their pre-motion letter, is an example of such a division of labor conspiracy case. There, some defendants sold one product, some another, and some both. The court found disputed facts concerning the single versus multiple conspiracy issue, because certain defendants (who were cooperating pursuant to the DOJ's leniency program) "admit[ted] coordination with respect to both product markets." Here, Plaintiffs do not allege any similar division of labor.

[4] The A&W allegations are set forth in a 2012 complaint filed in the Eastern District of Texas. They appear to be supplemented by information A&W provided to Plaintiffs' counsel in this case. Where information cited in the Complaint has been made available to Schein, we address why such information fails to support Plaintiffs' overarching conspiracy claim. Such information may be properly considered on this motion. *See In re Livent, Inc. Secs. Litig.*, 148 F. Supp. 2d 331, 367 (S.D.N.Y. 2001) ("According to the emerging rule in this Circuit, 'a district court may consider the full text of a document partially quoted in the complaint where . . . Plaintiffs have notice of the document's contents and the document is integral in drafting the complaint.'"); *see also In re Apple REITs Litig.*, 2015 WL 1345328, *3 (E.D.N.Y. 2015) ("[C]ourts may consider 'the full text of documents that are quoted in the complaint or documents that the Plaintiff either possessed or knew about and relied upon in bringing the suit.'").

*not* allege a conspiracy to fix prices by or among Schein, Patterson, and Benco. Nor did it allege a "nationwide" conspiracy. Instead, it alleged a "price-fixing conspiracy" between Schein and *non-defendant* Burkhart (referred to there as "Company X"), and an agreement among Schein, Burkhart, and certain *manufacturers* to "thwart A&W's growth in Oklahoma and Northwest Arkansas." *See* A&W Cmplt. ¶¶ 23, 26 (Ex. E). Neither Patterson nor Benco are mentioned.

Though A&W – the actual entity involved in the events at issue – did not claim Benco and Patterson were involved in any price-fixing agreement, Plaintiffs assert otherwise in the class Complaint. But Plaintiffs do not allege *any meeting* involving Benco, Patterson, and Schein (or any two of them) to fix prices. They do not identify the people allegedly involved, the dates of such meetings, or any specifics about an agreement. In fact, Plaintiffs allege no direct evidence whatsoever of an agreement.

Nor do they allege circumstantial evidence that could support a plausible inference of a price-fixing agreement among Benco, Patterson, and Schein. They have not identified any suspicious activities that would support such an inference. Rather, they allege the same types of facts – knowledge of the marketplace, general margin levels, and competitive dynamics – that are common to all concentrated industries. *See In re Elevator Antitrust Litig.*, 502 F.3d 47, 51 (2d Cir. 2007) ("similar pricing can suggest competition at least as plausibly as it can suggest anticompetitive conspiracy"); *cf. In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 397 (3d Cir. 2015) ("oligopolists may maintain supracompetitive prices through rational, interdependent decision-making"); *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1244 (3d Cir. 1993) ("it is quite likely that oligopolists acting independently might sell at the same above-marginal cost price as their competitors"); *In re Baby Food*

*Antitrust Litig.,* 166 F.3d 112, 122 (3d Cir. 1999) (tacit coordination "can be a necessary fact of life" in oligopolies).[5]

None of these kinds of allegations support a price-fixing claim.  At the pre-motion conference, this Court explained that the best way to determine whether a plausible claim has been stated is to go paragraph-by-paragraph through the Complaint and highlight the well-pled factual allegations.  March 23, 2016 Hrg. Tr., at 4-5.  Exhibit A takes this approach as to the alleged price-fixing agreement, and explains why the allegations do not support a plausible claim.  The references to Patterson and Benco, however, are so few that they are worth discussing here.

As for Patterson, there are just three.  *First*, Plaintiffs allege that Mr. Pettus of Dynamic Dental, the Oklahoma distribution partner for A&W, *asked* Mr. Lowery of Schein how to "'be accepted into the market' 'just like a [Burkhart] or a Patterson is.'"  Cmplt. ¶ 52.  Neither this cropped quote nor Mr. Lowery's response suggests (or in any way implies) Patterson was involved in price-fixing.  Mr. Pettus's question just recognizes that Patterson and Burkhart have been in the market for a long time, while his company (Dynamic Dental Solutions, Inc., a distinct dental distributor in Oklahoma and Arkansas that partnered with A&W to receive its supply lines) is a relative upstart with relatively few strong manufacturer relationships.  Indeed, Plaintiffs recognize the weakness of this allegation because in the pre-motion letter, they

---

[5] In their pre-motion letter, Plaintiffs cited *Anderson News, L.L.C. v. American Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012).  But there, plaintiffs identified the individual participants in meetings among all the alleged conspirators – detailed in a day-by-day chronology – in the days before they took simultaneous action to boycott the plaintiff.  Here, there are no such allegations concerning the overarching conspiracy or any aspect of it.

mischaracterize their own Complaint, attributing Mr. Pettus's *question* as a *statement* by Mr. Lowery. *See* P. Ltr. 2.[6]

    *Second*, Plaintiffs cite a different portion of that same conversation, in which Mr. Lowery notes, in passing, that if A&W is not selling a product, then another distributor, like "Patterson [is] going to be selling it." *Id*. ¶ 59. But this is not evidence of a price fixing agreement; it is recognition that Patterson is a large distributor selling the same products as A&W.[7]

    *Third*, Plaintiffs allege that certain Patterson employees (including personnel formerly employed by Schein) had a general understanding of minimum margins for dental equipment. *Id*. ¶¶ 69-70. But this is exactly the type of generalized competitive intelligence that any distributor in an allegedly concentrated market would be expected to have. *See Ross v. Am. Express. Co.*, 35 F. Supp. 3d 407, 447 (S.D.N.Y. 2014) ("information-seeking is common in concentrated markets, and such behavior is consistent with conscious parallelism rather than collusion"). It is not suggestive of a conspiracy. *Baby Food*, 166 F.3d at 126 ("mere possession of competitive memoranda" is not evidence of concerted action to fix prices).[8]

---

[6] The transcript is clear that Mr. Pettus repeatedly invited Schein to collude shortly after one if its suppliers, Pelton & Crane, terminated A&W. Ex. F, Tr. at 197-200. In the exchange cited by Plaintiffs, Mr. Pettus is simply asking how to get manufacturers to accept him as a distributor, like other larger or more established distributors. It does not evidence any agreement to fix prices, or much less suggest Patterson's involvement in any such agreement.

[7] The transcript also shows that Plaintiffs took the quote out of context. In it, Mr. Lowery recounted a discussion he had with a manufacturer rep (Dental EZ) and noted that he had told the rep that he did not want the manufacturer to give other distributors a better deal than Schein because it shouldn't matter if A&W is "selling it," or if Burkhart is, or if "Patterson [is] going to be selling it." Ex. F, Tr. at 257. This does not suggest a horizontal conspiracy among Patterson and others, but a desire by Schein, as a *customer*, to get the lowest price offered by its suppliers.

[8] Plaintiffs make much of the allegation that a distributor has a "minimum margin." Cmplt. ¶¶ 69-70. But this is true for every seller. A person who sells a house, for example, does not set the minimum price at "zero." There is a minimum asking price below which there is no deal. In a concentrated industry, sellers are able to monitor the marketplace, and generally have a good idea of market prices. That is why parallel pricing is not sufficient to create a plausible inference of a conspiracy. *See In re Elevator*, 502 F.3d at 51 ("similarities in contractual language, pricing, and equipment design" are not "plausible grounds to infer an agreement" because, while that conduct may be "consistent with conspiracy, [it is] just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market.")

As for Benco's supposed involvement in price fixing, Plaintiffs offer just two allegations. *First*, in paragraph 68, Plaintiffs make the convoluted assertion that an April 8, 2015 email "reflects Benco's understanding from a manufacturer that 'the competition [with Patterson for sales of the manufacturers' products] will be fair.'" *Id*. ¶ 68 (brackets in the Complaint, ***not*** the email). No one reading that email would think it reflected a price-fixing agreement. *See* Ex. G. It was simply an internal Benco email informing its field sales force that Pelton & Crane ("P&C") had just appointed Patterson as a rival distributor, and assuring the field that P&C would still offer Benco the support it needs to compete fairly against its larger rival. Plaintiffs contrary inference – that P&C had an "understanding" that Benco was fixing prices with Patterson, and that Benco's Sales Manager was taking this opportunity to inform the field that P&C had this understanding – is nonsense. *See Mayor & City Council of Balt., Md. v. Citigroup, Inc.*, 709 F.3d 129, 139 (2d Cir. 2013) (allegation that defendant obtained information about its supposed conspirators from "third parties" suggests "the absence" of a conspiracy).

*Second*, Plaintiffs identify a "settlement" offer that Benco supposedly made to A&W, and suggest that Benco would not have offered to settle any claims in which it was not complicit. The recording of this telephone call does not support that inference. As explained in more detail in Benco's motion, the call arose following Benco's acquisition of certain assets of Dynamic Dental, with which A&W had a joint venture. Mr. Cohen notes in the phone call that "I understand and recognize there is a debt." Mr. Pettus (who was the principal shareholder of Dynamic Dental and features in the allegations made by A&W) was at some point asked by A&W to join A&W's suit, and the call captures Benco's attempt "to make the whole thing" – the apparent "debt," and the need for Pettus and Benco to become part of a litigation – "go away without a lawsuit." It is not an offer by Benco to settle A&W's suit against Schein and Burkhart.

As such, it does not support any inference that Benco was involved in a price fixing conspiracy. *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 326 (3d Cir. 2010) ("independent self-interest is an 'obvious alternative explanation'" for circumstantial allegations of conspiracy) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009)).

B.    **The Complaint Does Not Plausibly Allege an Agreement Among Benco, Patterson, and Schein to Allocate Customers.**

The second "interrelated component" to the asserted "overarching conspiracy" is the supposed customer allocation agreement.  Cmplt. ¶¶ 3, 74.  Plaintiffs allege ***no facts*** to support this agreement.  *See* Ex. B (discussing applicable allegations paragraph-by-paragraph).  They do not allege when any such agreement was reached, or who was involved.  In fact, the nature and mechanics of the agreement are not clear, as Plaintiffs do not even claim that the Defendants agreed not to compete for each other's customers; just that they did not compete "actively."  *See* Cmplt. ¶ 74.  That is a conclusory characterization.  Moreover, even if Plaintiffs had alleged specific instances of diminished competition, that would not suffice to infer a conspiracy in the concentrated market pled.  *In re Florida Cement & Concrete*, 746 F. Supp. 2d 1291, 1311-12 (S.D. Fla. 2010) (allegations of "specific instances where one Defendant chose not to compete for another Defendant's customer . . . resemble the conscious parallel decisions not to compete alleged in *Twombly* which the Supreme Court found to be 'so natural' and inadequate to support a plausible inference of an unlawful agreement").

In lieu of an actual customer allocation agreement, Plaintiffs allege an agreement not to "poach" sales employees.  *See id.* ¶¶ 75-79.  Such an agreement would restrain competition, if at all, in the labor market, not the dental supplies market.  Notably, there are ***no allegations*** that Patterson was involved in the alleged no-poaching agreement.  As to Patterson, the most Plaintiffs muster is a reference to an unspoken "gentleman's agreement"– an allegation that is

devoid of any content or details concerning the how, when, or where of the supposed agreement. That is not enough. *Ulrich v. Moody's Corp.*, 2014 WL 4977562, *17 (S.D.N.Y. 2014) (statements "that the companies had an informal agreement" and an "unspoken rule" against hiring one another's employees failed to state claim).[9]

Even as to Schein and Benco, there is only speculation about ripple effects from the allegedly restrained labor market into the dental supplies market caused by "strong business and personal relationships" between dentists and sales representatives.[10] Cmplt. ¶ 75. No allegation suggests that the alleged labor-market restraint prevented any distributor from competing for any customer. Nor does Plaintiffs' speculation – that a no-poach agreement is tantamount to customer allocation because customers are supposedly chained to specific sales reps – transform the alleged no-poach agreement into either a customer allocation *agreement* or an agreement in furtherance of a broader price-fixing conspiracy. In essence, Plaintiffs have merely "recite[d] reasons why the companies would benefit from . . . an agreement" not to poach employees, applicable to any service-heavy industry, like dental supplies. *Ulrich*, 2014 WL 4977562, at *17. At bottom, a "no-poach" conspiracy in which Plaintiffs cannot identify "the actors, effect, victims, location, and timing" of the agreement is empty rhetoric, and cannot support a customer allocation scheme, or overarching conspiracy. *Id.* at *18 (distinguishing *In re High–Tech Employee Antitrust Litig.*, 856 F. Supp. 2d 1103 (N.D. Cal. 2012)).

---

[9] Also noticeably absent is an allegation that Burkhart, the purported ring-leader of the price-fixing conspiracy, was involved in this supposedly *critical* aspect of the overarching conspiracy. Likewise, there is no allegation that the alleged invitation to collude that forms the backbone of the alleged price-fixing conspiracy included a no-poach agreement.

[10] The only factual allegation concerns an alleged communication between Benco and Schein discussing an employee Benco hired after she was terminated from Schein, and whether there were short-term limitations on the functions the employee could perform. Agreements between two firms concerning employees that may have competitively sensitive information are adjudged under the rule of reason. *Bradford v. N.Y. Times Co.*, 501 F.2d 51, 60 (2d Cir. 1974) ("employee restraints" are construed under the "rule of reason"). If such an agreement were anticompetitive, it would only be so because of its effect on the labor market, not the underlying goods market.

C.   **The Complaint Does Not Plausibly Allege an Agreement Among Benco, Patterson, and Schein to Boycott (or Threaten to Boycott) Manufacturers, Trade Associations, or Dentists that Deal with Discounters**

The third component of the asserted "overarching conspiracy" is an alleged agreement among Benco, Patterson, and Schein to "boycott critical industry participants that dealt with lower-priced rivals." Cmplt. ¶¶ 80-129, 154-159. As with the asserted agreement to fix prices, the boycott allegations are an exercise in artful group pleading coupled with assertions of *unilateral* conduct. *See* Ex. C (discussing applicable allegations paragraph-by-paragraph). Such allegations neither constitute a plausible allegation of a group boycott nor support an "overarching" price-fixing conspiracy.

With few exceptions, the alleged threatened manufacturer boycotts involve A&W and Dynamic Dental. A&W's complaint, however, is devoid of any allegation of a *horizontal* conspiracy among Benco, Patterson, and Schein to boycott manufacturers that dealt with A&W. Instead, the class Complaint alleges nothing more than *vertical* discussions between a given Defendant and a given manufacturer. Most importantly, Plaintiffs do not allege any direct evidence of a horizontal group boycott of A&W's suppliers. Nor do they identify any meeting or communication involving any *two* (or more) of the three Defendants concerning such a boycott.[11]

Upon careful analysis, it is clear that Plaintiffs highlight a number of instances in which only a ***single*** Defendant complained about Dynamic Dental, followed by resulting action by the manufacturer. *See* Cmplt. ¶ 93 (Midmark); ¶ 120 (Belmont). For example, Plaintiffs allege that Midmark decided not to appoint Dynamic as a distributor because "you guys are hated so much

---

[11] The record is almost entirely devoid of allegations concerning Benco's participation in the alleged group boycotts. Plaintiffs try to create an inference of a conspiracy because when Skip Pettus was hired by Benco, P&C noted that there were no plans to cut off Benco because "Benco's right up there with Schein." Cmplt. ¶ 123. But this is just a recognition that Benco is substantially larger than A&W, and thus may be more important to P&C than A&W ever was. This statement does not support Plaintiffs' far-fetched inference that P&C was privy to a group boycott agreement among Benco, Patterson, and Schein and was taking this opportunity to reveal its existence to Mr. Pettus.

by Schein that you are too hot a topic to open as a distributor." *Id.* ¶ 93.  Plaintiffs also allege

that Schein told Royal Dental to choose between a multi-distributor consignment model with

Dynamic acting as a distributor, or a straight sale model without Dynamic. [12]  *Id.* ¶ 121; *see also*

¶ 120 (termination of Dynamic by Belmont Equipment and another unspecified manufacturer

without any allegation of a coordinated complaints).  None of these anecdotes suggest a

horizontal conspiracy.  *Citigroup*, 709 F.3d at 137 (allegations of "actions taken by market actors

who are aware of and anticipate similar actions taken by competitors . . . fall short of a tacit

agreement"); *Twombly*, 550 U.S. at 557, 567 (facts that are "***merely consistent with***" – but not

otherwise "suggestive of" – an illegal agreement does not suffice to state a conspiracy claim).[13]

Plaintiffs argue that these anecdotes support a conspiracy inference because a distributor

would not complain to manufacturers about rival discounters on its own.  Cmplt. ¶¶ 85; 92.  But

a distributor may have many reasons to complain about a discounter.  Consider the following.

Suppose a distributor carries equipment lines from two competing manufacturers.  One

manufacturer then appoints a rival discounter, driving margins down; the other does not.

Certainly, the distributor would prefer to promote the more profitable line, and may even drop

the less profitable one.  The distributor is free to tell the manufacturer as much, and the

manufacturer may freely act on that knowledge and terminate the discounter.

---

[12] Plaintiffs apparently see nefarious intent from a distributor's desire to switch to a "consignment model."  But a consignment (or broker) model is a reasonable method for shifting pricing decisions to the manufacturer.  It does not imply a horizontal group boycott.  Were it otherwise, every real estate broker, for example, could be accused of engaging in a group boycott because it does not first buy the house, and then resell it at its own risk.

[13] Plaintiffs also allege that, in 1997 (11 years before the start of the alleged conspiracy), Schein told A&W that if A&W did not sell itself to Schein, Schein would "put it out of business."  Cmplt. ¶ 87.  Even if such a statement had been made, there is nothing unlawful about it or its sentiment.  *See Geneva Pharm. Tech. Corp. v. Barr Labs Inc.*, 386 F.3d 485, 489 (2d Cir. 2004) ("When individual firms go head-to-head, one might wish that the rules of the Marquis of Queensberry . . . would be uppermost in the competitors' minds. The antitrust laws, however . . . are not designed to protect competitors from one another's conduct.").  Nor is such a statement indicative of a horizontal conspiracy.  If it were otherwise, virtually every bankruptcy case would be coupled with an antitrust case against the remaining competitors in the market.

Nothing in logic supports the view that this example implies a conspiracy, and hornbook law is entirely to the contrary. "[C]omplaints about price-cutters are natural—and from the manufacturer's perspective, unavoidable—reactions by distributors to the activities of their rivals." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 763 (1984). The kind of grievances that feature in the Complaint "arise in the normal course of business and do not indicate illegal concerted action." *Id.* As the Supreme Court explained, "[t]o permit the inference of concerted action on the basis of receiving complaints" and "acting" on them "would both inhibit management's exercise of independent business judgment and emasculate the" Sherman Act. *Id.* at 764.

Plaintiffs next allege that a few of A&W's suppliers received complaints from multiple distributors. *See* Cmplt. ¶¶ 91, 93, 94-97, 100-108, 112, 114, 116, 119.[14] Many of these allegations are clouded by improper group pleading. For example, Paragraph 93 asserts that Schein and Patterson "vowed to refuse to distribute . . . Midmark's products," but Plaintiffs only identify a single communication and it is wanting: in it, Midmark told Dynamic that "you guys are hated so much *by Schein* that you are too hot . . . to open up as a distributor." That is a vertical, not horizontal, allegation. Other allegations are as devoid of specifics concerning dual complaints. *See*, *e.g.*, *id.* ¶ 112 (Scican); ¶ 114 (Coltene-Whaledent); ¶ 116 (Bien-Aire); ¶ 119 (Dental EZ).

---

[14] Plaintiffs also engage in group pleading to suggest that other manufacturers may have received complaints about A&W from multiple distributors. *See* Cmplt. ¶ 119 (Dental EZ); ¶ 116 (Bien Aire); ¶ 117 (Danaher, and its affiliates, including Airbex); ¶ 118 (KaVo). These allegations are conclusory because they do not identify the time, place, or manner of the alleged complaints, or the alleged participants in these communications. *LaFlamme v. Societe Air France*, 702 F. Supp. 2d 136, 148 (E.D.N.Y. 2010) (dismissing complaint where "allegations fail to identify any specifics regarding the claimed illegal agreement). But even if the fact of the complaints were taken as true, there is no well-pled allegation suggesting that there was a pre-existing agreement to coordinate such complaints.

But even where Plaintiffs have alleged complaints by multiple distributors, it signifies nothing. Once it is recognized that distributors often complain about discounters based on their unilateral self-interest, allegations that each distributor complained do not create an inference of a pre-existing agreement. As the Second Circuit has held, "alleging parallel conduct alone is insufficient, even at the pleading stage." *Citigroup,* 709 F.3d at 136. Rather, "parallel conduct allegations 'must be placed in a context that raises a suggestion of a *preceding agreement*, not merely parallel conduct that could just as well be independent action.'" *Id.* at 137.

Here, Plaintiffs contend that various Defendants complained to manufacturers about A&W (or other discounters), but there is no reason to think that such complaints "would probably ***not*** result from chance, coincidence, ***independent responses to common stimuli***, or mere interdependence unaided by an advance understanding among the parties." *Id.* (quoting *Twombly*, 550 U.S. at 556 n.4). The Supreme Court, as noted, considers these complaints "natural." *See supra.*

Plaintiffs try to insinuate such an agreement by asserting that "complaints . . . made jointly on the same call or coming on the same day . . . would not have happened absent [prior] agreement." Cmplt. ¶¶ 98, 122 (same). But Plaintiffs do not identify ***any*** joint calls, and the only alleged same-day call concerned a ***specific bidding situation*** for a Sacramento dentist, Dr. Wee. That bidders for a specific piece of business would call the relevant supplier to discuss that bid is hardly suggestive of a conspiracy.[15] Plaintiffs' mere *opinion* to the contrary is unpersuasive. *Id.* ¶ 92.[16]

---

[15] Plaintiffs also point to an allegation that Schein complained to P&C on a number of occasions, including January 15, 2008, and that Burkhart also complained at *unspecified times* beforehand. *Id.* ¶¶ 94-97. But that is not an allegation of suspicious timing. Nor is it suspicious that Schein allegedly knew about P&C's termination of Dynamic a few days before P&C officially told Dynamic. *Id.* at ¶ 97. There is no reason why Schein would not have learned this directly from P&C. Indeed, the conclusory allegation of a pre-existing agreement with *Burkhart* is

Plaintiffs next argue that the distributor complaints must be coordinated because A&W's prices are "non-public," so complaints would only arise if the distributors "were regularly communicating . . . as part of the . . . group boycott. Cmplt. ¶ 110.  But Plaintiffs do not allege that multiple Defendants had knowledge of the *same* instance of pricing offered by A&W. Rather, Plaintiffs only allege typical competitive intelligence of the type that each distributor would normally have.  *See id*. ¶ 101 (speaks only to Schein's knowledge of a specific offer to a specific dentist); ¶ 102 (speaks only to Instrumentarium's knowledge about A&W's offers to multiple dentists, not about multiple distributors' knowledge of the same dentist); ¶ 104 (speaks only to Schein's knowledge that A&W offered a free flat screen TV to a specific dentist).  In any event, in the concentrated market pled, in which senior employees are said to move from one firm to another, knowledge of a rival's inner workings, or competitive losses or gains, is not unexpected, or probative of conspiracy. *See* Areeda & Hovenkamp, *Antitrust Law* ¶ 1429, at 206 (2nd ed. 2000) (in a concentrated market any single firm's "price and output decisions will have a ***noticeable*** impact on the market and on its rivals").

---

undermined by the very conversation Plaintiffs cite to support it, which shows that – rather than being a coordinated effort to complain – P&C specifically solicited Burkhart's views.  *See* Ex. F, Tr. at 43 (The ***Pelton & Crane*** rep "asked me [Jack Powers of Burkhart] what I thought about it," and "I told him, I said:  Well, I don't think he's put in the time, but you got to do what you got to do.").  Similarly, Plaintiffs point to an email in which a manufacturer sales director notes that he received two calls "today" from unspecified people, without noting whether the calls were from dealers or the manufacturer reps, the latter of whom were also "upset" about A&W.  Cmplt. ¶ 106.  There is nothing suspicious about this email.  Ex. H.  In fact, it explains why manufacturers may not want to support A&W, especially in areas where it cannot provide "proper support."  *Id*.

[16] Relatedly, Plaintiffs speculate that a manufacturer has no interest preventing discounting by distributors because its interest is solely in the wholesale price it receives. Cmplt. ¶ 111.  If that were the case, then manufacturers would never appoint exclusive territories or impose any other form of vertical restraint, all of which are ubiquitous and lawful.  Such vertical restraints – even at the behest of a distributor –  do not create an inference of a *horizontal* conspiracy to impose such restraints. *See In re Musical Instruments &Equip. Antitrust Litig.*, 798 F.3d 1186, 1198 (9th Cir. 2015) (where defendant allegedly "used its substantial market power to pressure each manufacturer to adopt similar policies, and each manufacturer adopted those policies as in its own interest" that still "does not suggest the manufacturers illegally agreed among themselves to restrain competition").

Plaintiffs also make similar allegations that the Defendants complained about other distributors or resellers.  Cmplt. ¶ 128 (SourceOne); ¶¶ 154-56 (Amazon); ¶ 158 (Pearson Dental).  As above, Plaintiffs do not identify any actual joint communication.  Instead, they rely on group pleading and allegations of ordinary vertical complaints about potential discounters. For the same reasons, such allegations do not create a plausible inference of a pre-existing *horizontal* agreement to boycott manufacturers that deal with lower cost sellers. *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 327 (2d Cir. 2010) ("[u]nder *Twombly,* allegations of parallel conduct that could 'just as well be independent action' are not sufficient to state a claim").

The insufficiency of Plaintiffs' allegations is demonstrated by the Second Circuit's decision in *H.L. Hayden Co. of New York, Inc. v. Siemens Medical Systems, Inc.*, 879 F.2d 1005, 1014 (2d Cir. 1989).  That case involved similar claims involving the dental distribution market. Specifically, Schein (a plaintiff in that case), alleged that two of its rivals, including Patterson, conspired to pressure manufacturers to terminate Schein.  The Second Circuit rejected the group boycott claim on both horizontal and vertical grounds.  As the court explained, while "there was evidence of distributor complaints concerning [Schein's] mail order sales and pricing levels . . . *Monsanto* makes clear that a termination in response to complaints does not establish a section one violation."  *Id.*  Though decided on summary judgment, *Hayden* is notable because the court held that, even if all the facts presented were true, there would still be no claim.  The facts alleged by Plaintiffs here fall far short of those set forth in *Hayden*.[17]

---

[17] Plaintiffs also assert that there are "other factors indicating an unlawful conspiracy" including higher net profits than "pharmaceutical distributors."  Cmplt. ¶ 178.  But the fact that two different markets, with different products, different capital requirements, different competitive dynamics, have different net profits (on a percentage basis) is irrelevant.  Plaintiffs also allege unspecified communications among defendants, *see id.* ¶ 179, which is a conclusory group pleading, and nothing more than "opportunity" evidence, which does not help state a claim.  *See Twombly*, 550 U.S. at 563 n.8; *Florida Cement*, 746 F. Supp. 2d at 1316 (allegations that "executives employed by Defendants formed close business and personal relationships" do not "suggest a conspiracy."); *Ross,* 35 F. Supp. 3d at 443-44

D.     **The Complaint Does Not Plausibly Allege a Conspiracy Among Schein and Burkhart**

Because the allegations of an overarching conspiracy involving Benco, Patterson, and Schein are lacking, that claim must be dismissed.  During the pre-motion conference, however, Plaintiffs suggested that the allegations of a price-fixing conspiracy involving Schein and non-defendant Burkhart would allow the claim to go forward.  But Plaintiffs have alleged a singular Sherman Act claim based on a singularly broad conspiracy.  They have not brought a claim concerning a separate, limited conspiracy between Schein and Burkhart.  They have not, for example, alleged that Burkhart failed to attend the tradeshows or otherwise boycotted SourceOne.  Nor have they alleged that Burkhart was a party to any customer allocation or no-poach agreement.  Thus, they have not alleged an "overarching conspiracy," even as to Schein and Burkhart.  Though this is sufficient to dismiss the case entirely, it bears emphasis that conspiracy allegations involving Schein and Burkhart fail to satisfy *Twombly*.  Exhibit D discusses each such allegation, and explains why the allegations fail to plausibly allege an unlawful agreement between Schein and Burkhart.[18]

---

(even "unusually high amount of inter-firm communications" uncovered there were insufficient to prove a conspiracy).  In fact, the only joint communication Plaintiffs allege (other than ones related to SourceOne's involvement) involve a dinner arranged by a manufacturer, in which there was a joking reference about how to help the manufacturer gain more sales and "make [his] bonus." Cmplt. ¶ 187 (attached as Ex. I).  Neither the dinner nor the topic is unlawful and neither speaks to a price-fixing conspiracy.  Plaintiffs also take statements out of context.  The reference to having a discussion over personal email reflects a discussion between Benco and a potential job applicant (who currently works for Schein).  *Id.* at 188 (attached as Ex. J).  That a potential employee would not want to discuss a job opportunity on his existing employer's email does not suggest a conspiracy among the hiring firm and the applicant's existing firm.  Plaintiffs also cite an internal Patterson email noting that it may be better to have discussions with the TDA behind closed doors.  Plaintiffs provide no reason a private business meeting, not involving competitors, is suspicious.

[18] It is also worth noting that, even if Plaintiffs could plead a claim based on an alleged unlawful agreement between Schein and Burkhart, such a claim would need to be severed from any remaining claims involving Benco, Patterson, and Schein, since such a claim would involve different facts, time periods, actors, and events.  In any event, it would be premature to determine whether such a claim could go forward, since it has not been alleged.

19

## III. THE COURT IS EMPOWERED TO DISMISS THE CASE OR LIMIT IT TO THE SOURCEONE TRADE-SHOW ATTENDANCE ALLEGATIONS.

In their pre-motion letter, Plaintiffs asserted that even if the Complaint fails to plausibly plead an overarching conspiracy, the Court is powerless to dismiss the claim or otherwise limit the Complaint to a narrower plausible core. But Plaintiffs cited no case allowing the non-plausible aspects of a complaint to go forward. Should the Court decide not to dismiss the entire Complaint, the Court should in no circumstance leave this Complaint intact. Multiple options are available to the Court supported by the case law and are appropriate here.

*First,* and foremost, the Court may dismiss the entire Complaint. This Court's job is not to blue-pencil a deficient complaint, but to determine whether the claim alleged – here an overarching conspiracy – is plausible. If not, complete dismissal is appropriate. For example, in *Optical Disk Drive*, the Court dismissed the complaint because it failed to plausibly allege a broad overarching conspiracy, noting that it was "premature" to determine "whether allegations substantially similar to the existing complaint might be sufficient to support … a narrower conspiracy." 2011 WL 3894376, at *8. *Iowa Ready-Mix Cement* held the same:

> While it is entirely possible that the plaintiffs have pleaded sufficient factual basis for claims against subsets of defendants for separate antitrust conspiracies, they have expressly relied on an 'overarching' conspiracy among all of them them that simply is not supported by any factual allegations in the present Amended Consolidated Complaint. Therefore, they have failed to state an antitrust conspiracy claim upon which relief can be granted, and dismissal of the present antitrust conspiracy claim is appropriate.

768 F. Supp. 2d at 979; *see also Florida Cement*, 746 F. Supp. 2d at 1319, (dismissing complaint because facts alleged "do not plausibly support the entire statewide, ten-Defendant, two-product conspiracy alleged by Plaintiffs" and directing plaintiffs to serve an amended complaint alleging a claim more "modest" is several respects).

20

In their pre-motion letter, Plaintiffs argued otherwise, claiming that a motion to dismiss the complaint "would . . . be futile" if the SourceOne trade show allegations are "sufficiently pled," and cited *In re Lithium Ion Batteries Antitrust Litigation*, 2014 WL 309192, at *2 (N.D. Cal. 2014) as support. *See* P. Ltr., 2. But *Lithium Ion* did exactly what Plaintiffs say this Court cannot: it dismissed the complaint with leave to amend. *See* 2014 WL 309192, at *12 (dismissing entire complaint, with leave to amend, because it alleged an "*overly long class period*" and insufficiently plausible allegations as to certain defendants). Here, if the Court wishes to follow *Lithium Ion,* it may dismiss the Complaint with leave to serve an amended complaint limited to the SourceOne trade show allegations.[19]

*Second*, if the Court wants to blue-pencil the Complaint, it can dismiss the portions of it that are not plausibly alleged. Courts frequently limit complaints, under Rule 12(b)(6), to their well-pled elements. *See*, *e.g.*, *In re Credit Default Swaps Antitrust Litig.*, 2014 WL 4379112, *14 (S.D.N.Y. 2014) (dismissing *part of claim* seeking damages prior to December 2008 because the "Complaint does not plausibly allege injury-in-fact as early as the date specified.").[20] Here, it is even more appropriate to dismiss the overarching conspiracy. Plaintiffs could have included separate counts – one for an overarching conspiracy, and one for the SourceOne trade show allegations – but chose not to. Had they done so, this Court could have dismissed the former, without the latter. Artful pleading, however, does not restrict this Court's power to use 12(b)(6)

---

[19] Plaintiffs also cite *In re Air Cargo Shipping Services Antitrust Litigation* 2014 WL 7882100, *38 (E.D.N.Y. 2014), claiming that it stands for the *unquoted* proposition that "Defendants' attempts to litigate the scope and boundaries of the conspiracy at this stage should be rejected." P. Ltr., 4. But that decision involved summary judgment, and the Court concluded that plaintiffs had, in fact, "supplied compelling common evidence of a global conspiracy." Plaintiffs also cite to an earlier *Air Cargo* decision, in which the Court held that there were sufficient allegations of a conspiracy since *18 defendants pled guilty* or otherwise admitted their involvement in price-fixing. *In re Air Cargo*, 2009 WL 3443405, *1 (E.D.N.Y. 2009). Here, there are *no* guilty pleas.

[20] Notably, under Rule 56(a), a party may seek judgment on a "*part* of [a] claim." Fed. R. Civ. P. 56(a), and Rule 12(c) allows the court to enter judgment on the pleadings, employing the same standards as Rule 12(b)(6). Thus, a court may appropriately dismiss part of a claim on a motion to dismiss.

to shape the claims that may go forward. *Cf. Precision Assocs.*, 2011 WL 7053807, at *29 (allowing separate conspiracies, where well-pled, to go forward, but rejecting overarching "nation-wide conspiracy" claim cobbled from "various local conspiracies").

*Third*, the Court may strike the portions of the complaint under Rule 12(f) that are unrelated to the SourceOne trade show issues.  Should the Court elect not dismiss to the Complaint outright, this is an appropriate use of the Court's power to eliminate "immaterial" allegations from a complaint, as allegations that do not support a plausible claim are by definition immaterial.  Because deficient allegations merely distract, motions to strike "serve a useful purpose by . . . saving the time and expense [that] would otherwise be spent in litigating issues that would not affect the outcome of the case." *Simon v. Mfrs. Hanover Trust Co.*, 849 F. Supp. 880, 882 (S.D.N.Y. 1994); *Estee Lauder, Inc. v. Fragrance Counter, Inc.*, 189 F.R.D. 269, 272 (S.D.N.Y. 1999) (the "[i]ncreased time and expense of trial may constitute sufficient prejudice to warrant granting plaintiff's Rule 12(f) motion").  For example, in *Briggs & Stratton Corp. v. Kohler Co.,* 405 F. Supp. 2d 986, 987-88 (W.D. Wis. 2005), Kohler brought a single monopolization claim, based on two types of exclusionary conduct: bundled rebates and false statements. The latter was not legally cognizable, but would have been costly to address, and was rightly stricken.

In their pre-motion letter, Plaintiffs cite boilerplate that motions to strike are "not favored," essentially arguing that the remedy is only available if the allegation is inflammatory or defamatory.  Their interpretation reads the word "immaterial" right out of the rule.  Yet courts frequently strike implausible allegations on just those grounds. *See Reiter's Beer Distributors, Inc. v. Christian Schmidt Brewing Co.*, 657 F. Supp. 136, 145 (E.D.N.Y. 1987) (striking allegations detailing separate legal disputes in the same industry because "plaintiff has not

22

sufficiently connected these past cases, or the factual settings therein, to the present action to render references thereto relevant and immune from a motion to strike"). Nor can Plaintiffs find solace in Wright & Miller's statement that that Rule 12(f) is not a "proper way to procure the **dismissal** of all or part of a complaint." *See* P. Ltr., 2 (*citing* Wright & Miller, 5C Fed. Prac. & Proc. Civ., § 1380 (3d ed.)). That is because striking implausible allegations is not a "dismissal." *See Giles v. Phelan, Hallinan & Schmieg*, 901 F. Supp. 2d 509, 530 (D.N.J. 2012) (drawing distinction). More importantly, in the very next sentence, Wright & Miller note that, if dismissal is warranted, the Court should use its authority under Rule 12(b)(6). They do not suggest, as Plaintiffs would have it, that courts are powerless to remove implausible aspects of a Complaint from the case. *Id.*[21]

*Fourth*, the court may exercise its authority under Rule 16 to "simplify[] the issues" or "eliminat[e] frivolous claims." Fed. R. Civ. P. 16(c)(2)(A). In their pre-motion letter, Plaintiffs do not dispute that Rule 16 is an appropriate mechanism to eliminate insufficiently pled aspects of Plaintiffs' claims, and to limit discovery and further pre-trial proceedings accordingly. Nor could they, as the Rule's purpose is to "discourage[e] wasteful pre-trial activities." *Id.* at (a)(3); *see* Wright & Miller, 6A Fed. Prac. & Proc. Civ. § 1529 (3d ed.) ("court may be able to strike [an issue] that could not be attacked successfully by a Rule 12(f) motion at the pleading stage" by "eliminat[ing] it under Rule 16 in order to simplify the issues.").

---

[21] The Second Circuit approves of the use of Rule 12(f) to strike immaterial allegations – such as the existence of a parallel government investigation – from an antitrust complaint. *Lipsky v. Commw. United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976); *In re Merrill Lynch & Co., Inc. Research Reports Secs Litig.*, 218 F.R.D. 76, 78-79 (S.D.N.Y. 2003) ("Second Circuit case law makes it clear that references to preliminary steps in litigations and administrative proceedings that did not result in an adjudication on the merits . . . are, as a matter of law, immaterial under Rule 12(f).") (collecting cases); *Low v. Robb*, 2012 WL 173472, * 9 (S.D.N.Y. 2012) (same).

## IV.     CONCLUSION

For the foregoing reasons, this Complaint should be dismissed, or in the alternative the Complaint should be limited under Rules 12(b)(6), 12(f), and/or 16 to the alleged SourceOne trade show boycott allegations.

Dated: May 4, 2016

                    Respectfully submitted,

                    /s/ *Colin R. Kass*
                    Colin R. Kass (admitted *pro hac vice*)
                    Scott M. Abeles (admitted *pro hac vice*)
                    Stephen R. Chuk
                    PROSKAUER ROSE, LLP
                    1001 Pennsylvania Ave., NW
                    Washington, DC 20004
                    Telephone:  202-416-6800
                    ckass@proskauer.com
                    sabeles@proskauer.com
                    schuk@proskauer.com

                    Bradley I. Ruskin
                    David A. Munkittrick
                    PROSKAUER ROSE, LLP
                    Eleven Times Square
                    New York, NY 10036
                    Telephone: 212-969-3226
                    bruskin@proskauer.com
                    dmunkittrick@proskauer.com

                    *Counsel for Defendant Henry Schein, Inc.*

24

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 4th day of May, 2016 I caused to be electronically filed the foregoing Memorandum of Law in Support of Defendant Henry Schein, Inc.'s Motion to Dismiss the Consolidated Class Action Complaint with the Clerk of Court through the CM/ECF system.  Notice of this filing will be sent by email to all parties by operation of the court's electronic filing systems.  Parties may access the filing through the Court's CM/ECF System.

/s/ *Colin R. Kass*

Colin R. Kass