Howard D. Scher
Thomas P. Manning
Samantha L. Southall
Jackson E. Warren
**BUCHANAN, INGERSOLL & ROONEY PC**
Two Liberty Place, 32nd Floor
50 South 16th Street
Philadelphia, Pennsylvania 19102-2555
(215) 665-8700
Counsel for Defendant Benco Dental Supply Company

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
: 
In re DENTAL SUPPLIES ANTITRUST : **DEFENDANT BENCO DENTAL**
LITIGATION : **SUPPLY COMPANY'S**
: **REPLY MEMORANDUM OF**
: **LAW IN SUPPORT OF ITS**
: **MOTION TO DISMISS THE**
: **CONSOLIDATED CLASS**
: <u>**ACTION COMPLAINT**</u>
:
: 16 Civ. 696 (BMC)
:
: **ALL CASES**
:
------------------------------------------------------------ X

## **TABLE OF CONTENTS**

                                                             **Page**

INTRODUCTION ..................................................................................................................1

ARGUMENT .........................................................................................................................3

      I.      The CCAC Does Not Contain Sufficient Factual Allegations To Make Plausible Plaintiffs' Claim That Benco Participated In The Alleged Margin Fixing Agreement.......................................................................................3

            A.      The Court May Properly Consider The Transcripts and Documents Submitted By Benco. ...................................................................................5

            B.      The Court Need Not Accept Plaintiffs' Unreasonable Characterization Of The Materials Or Their Unreasonable Inferences. ..................................................................................................9

            C.      Allegations That Defendants Earned "Supra-Competitive" Profits Describe A Legal, Functioning Oligopoly And Does Not Raise An Inference Of Conspiracy. ..........................................................................10

      II.     The CCAC Does Not Raise A Reasonable Inference That Benco Participated In A "No-Poaching" Or "Customer Allocation" Agreement.............11

      III.    The CCAC Does Not State A Claim Based Upon The SourceOne Allegations. ..................................................................................................14

CONCLUSION....................................................................................................................15

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Acquaire v. Canada Dry Bottling Co.*,
   24 F.3d 401 (2d Cir. 1994) ................................................................................................. 9

*In re Air Cargo Shipping Services Antitrust Litigation*,
   No. 06-MD-1775, 2009 WL 3443405 (E.D.N.Y. Aug. 21, 2009) ....................................... 8

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................................................... passim

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................................... 1, 2, 5, 6

*Bon-Ton Stores, Inc. v. May Department Stores Co.*,
   881 F. Supp. 860 (W.D.N.Y. 1994) .................................................................................. 15

*Boykin v. KeyCorp*,
   521 F.3d 202 (2d Cir. 2008) ............................................................................................... 6

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
   509 U.S. 209 (1993) .......................................................................................................... 11

*Castro v. Sanofi Pasteur Inc.*,
   No. 11-cv-7178, 2012 WL 12516572 (D.N.J. Aug 6, 2012) ............................................ 15

*Evolution Dental Science LLC v. Benco Dental Supply Company, et al.*,
   No. 1:16-cv-596, ECF No. 1 ............................................................................................. 14

*In re Flat Glass Antitrust Litigation*,
   385 F.3d 350 (3d Cir. 2004) ....................................................................................... 10, 11

*Global Network Communications, Inc. v. City of New York*,
   458 F.3d 150 (2d Cir. 2006) ....................................................................................... 2, 5, 7

*Higgins v. New York Stock Exchange*,
   775 F. Supp. 113 (S.D.N.Y. 1991) ................................................................................... 15

*Iqbal v. Hasty*,
   490 F.3d 143 (2d Cir. 2007), *rev'd and remanded sub nom. Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ........................................................................................................... 6

*L-7 Designs, Inc. v. Old Navy, LLC*,
   647 F.3d 419 (2d Cir. 2011) ............................................................................................... 5

Case 2:16-cv-01377-BMC-GRB Document 25 Filed 06/15/16 Page 4 of 20 PageID #: 742

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,
 551 U.S. 877 (2007) ........................................................................................................................9

*LePage's Inc. v. 3M*,
 324 F.3d 141 (3d Cir. 2003) ..........................................................................................................15

*Lobaito v. Chase Bank*,
 529 F. App'x 100 (2d Cir. 2013) ....................................................................................................6

*Lopez-Serrano v. Rockmore*,
 132 F. Supp. 3d 390 (E.D.N.Y. 2015) ............................................................................................6

*Mayor of Baltimore v. Citigroup, Inc.*,
 709 F.3d 129 (2d Cir. 2013) ....................................................................................................10, 11

*McWane, Inc. v. F.T.C.*,
 783 F.3d 814 (11th Cir. 2015) ......................................................................................................15

*Monsanto Co. v. Spray-Rite Service Corp.*,
 465 U.S. 752 (1984) ........................................................................................................................9

*New York Citizens Committee on Cable TV v. Manhattan Cable TV, Inc.*,
 651 F. Supp. 802 (S.D.N.Y. 1986) ...............................................................................................15

*Robb v. Connecticut Board of Veterinary Medicine*,
 No. 15-cv-906, 2016 WL 236209 (D. Conn. Jan. 20, 2016) .......................................................15

*Roth v. Jennings*,
 489 F.3d 499 (2d Cir. 2007) ............................................................................................................7

*Sahu v. Union Carbide Corp.*,
 548 F.3d 59 (2d Cir. 2008) ..........................................................................................................6, 7

*New York ex rel. Schneiderman v. Actavis PLC*,
 787 F.3d 638 (2d Cir. 2015) ..........................................................................................................15

*St. John's University v. Bolton*,
 757 F. Supp. 2d 144 (E.D.N.Y. 2010) ............................................................................................6

*In re Text Messaging Antitrust Litigation*,
 782 F.3d 867 (7th Cir. 2015) ........................................................................................................11

*Washington v. Gonyea*,
 538 F. App'x 23 (2d Cir. 2013) ......................................................................................................6

**Other Authorities**

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (2d ed. 2000) .......................................10

iii

## INTRODUCTION

An unadjudicated lawsuit pending in Texas by a disgruntled competitor, Archer & White, alleging a conspiracy *only* between Defendant Schein and non-defendant Burkhart; a single recorded conversation between Archer & White and Benco regarding the potential willingness of Benco to pay Dental Dynamic's debt to Archer & White (which did not occur); a conversation in which an Archer & White representative heard a Patterson representative acknowledge that he knew the average margins in the industry; a few low-level communications between Defendants as to whether any of them intend to attend two trade shows when the associations sponsoring the shows were promoting a potential competitor's sales — this does not meet Plaintiffs' burden to provide plausible factual allegations sufficient to pursue its single claim that Benco participated in an overarching eight-year nationwide price-fixing conspiracy.

Under *Bell Atlantic Corp. v. Twombly*, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." 550 U.S. 544, 570 (2007). In its opening brief, Benco showed, *through the very materials that Plaintiffs relied upon in framing their complaint*, that the "facts" alleged to show Benco's participation in the alleged "overarching agreement" not to compete on price actually misrepresented the documents and recorded conversations Plaintiffs relied upon. Accordingly, those "facts" do not state a plausible claim against Benco in the generally implausible "overarching conspiracy" alleged in Plaintiffs' Consolidated Class Action Complaint ("CCAC").

Plaintiffs make no reasonable explanation for these documented misrepresentations. Instead of acknowledging their misrepresentations and trying to salvage their claims without relying upon them, Plaintiffs offer two, ultimately futile, responses. First, they argue that the Court must keep its eyes shut and accept Plaintiffs' mischaracterizations of their own sources — but Plaintiffs are wrong on this point. The Second Circuit and numerous district courts within it

have recognized that a court considering a motion under Rule 12(b)(6) may properly consider the full contents of taped conversations and other documents relied upon by a plaintiff in making allegations in a complaint. Benco's Memorandum of Law in Support of Its Motion to Dismiss the CCAC ("Benco Mem.") at 4-5. The transcripts of taped conversations and documents at issue were used and (mis)quoted extensively throughout the CCAC, and Plaintiffs relied upon those materials attempting to raise the inference that Benco participated in the alleged conspiracy.

Plaintiffs' "blinders on" argument — that this Court should not consider the very documents underlying the CCAC in assessing its plausibility — would make a mockery of the Supreme Court's ruling in *Twombly*. Under Plaintiffs' view of the law, although *Twombly* requires a complaint to plead sufficient facts to suggest a plausible claim of conspiracy, a plaintiff may easily skirt *Twombly* and proceed with an obviously meritless claim by crafting a façade of supporting facts based upon misleading, selective quotes and misrepresentations. However, the purpose behind the rule allowing a court to consider materials plaintiffs rely upon is to prevent plaintiffs from doing exactly that — dragging defendants through expensive discovery and summary judgment proceedings based upon "clever drafting." *See Global Network Communications, Inc. v. City of New York,* 458 F.3d 150, 157 (2d Cir. 2006) (citations omitted) ("The exception thus prevents plaintiffs from generating complaints invulnerable to Rule 12(b)(6) simply by clever drafting.").

Second, Plaintiffs double down and offer preposterous interpretations of the clear statements in the documents and recordings and then assert that the Court is bound to accept their unreasonable interpretation of those statements. That is wrong as well. When ruling on a motion to dismiss, a court may "draw on its judicial experience and common sense," and need only draw "reasonable inference[s]" in a plaintiff's favor to determine whether a complaint states a claim

for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009) (citations omitted). Nothing in the law prevents this Court from peering through the CCAC to the "supporting" materials, disregarding allegations that are misleading on their face, and rejecting the unreasonable inferences that Plaintiffs seek to draw therefrom.

Stripped of these misrepresentations, there are no specific factual allegations raising an inference that Benco entered into the alleged "overarching conspiracy," the alleged "margin fixing" agreement, or the alleged "no-poach" (or "customer allocation") agreement — with Schein, Patterson or Burkhart — or entered into any agreement with those companies to threaten boycotts against companies that sold products to discount suppliers. As to the claims based upon the threatened boycotts of the Texas and Arizona state dental association meetings, it remains the case that Plaintiffs have failed to plead facts sufficient to state a claim on behalf of a nationwide class of customers. As a result, this Court should dismiss the Consolidated Class Action Complaint ("CCAC") in its entirety.

**ARGUMENT**

I. THE CCAC DOES NOT CONTAIN SUFFICIENT FACTUAL ALLEGATIONS TO MAKE PLAUSIBLE PLAINTIFFS' CLAIM THAT BENCO PARTICIPATED IN THE ALLEGED MARGIN FIXING AGREEMENT.

The CCAC does not identify any direct evidence of Benco's agreement to enter into, or participate in, the alleged "overarching conspiracy" not to compete on price or the alleged "margin fixing" component thereof. There are no allegations regarding who, on behalf of Benco, reached any such agreement, or when or where the agreement supposedly came into existence. It does not cite to any Benco communication discussing, or even hinting at, Benco's participation in such an agreement. Instead, the CCAC relies upon conclusory allegations and supposed circumstantial evidence derived from taped conversations and a Benco internal email to support an inference that Benco was part of the "margin fixing" agreement. On the surface, Plaintiffs'

3

allegations may appear compelling and supported by unusual detail (as the Court noted at the March 23, 2016 Hearing). But as Benco identified in its motion to dismiss, the critical evidence Plaintiffs point to in support of their claims against Benco on this issue was manufactured by Plaintiffs themselves, by (1) substituting their own language in a key document; (2) excising relevant parts from quotes set forth in the CCAC; and (3) otherwise misrepresenting the materials. For example:

- Plaintiffs falsely represent that distributors other than Schein and Burkhart were implicated in the "margin fixing" complaint filed by Archer & White (Benco Mem. at 6-7);

- Plaintiffs assert that there is no possible explanation for Benco to have offered payment to Archer & White other than to hide Benco's supposed involvement in the "margin fixing" agreement, but in quoting from a taped conversation, Plaintiffs deleted the reference to a "debt" owed to Archer & White and the statement by Benco's Charles Cohen that he was concerned with "having *Skip [Pettus] sue Burkhart and sue Schein now that he works for Benco*"[1] (*Id.* at 10-11); and

- Plaintiffs insert their own language into an internal Benco email to its sales representatives that described the expected effects of manufacturer Pelton & Crane's decision to add Patterson as an authorized distributor of its products — Plaintiffs falsely turned a statement expressing a belief that Benco would be treated fairly by Pelton & Crane now that it would be placing orders to Pelton & Crane alongside a much larger rival, Patterson, into a statement describing competition between Benco and Patterson for *sales* of Pelton & Crane products to customers (*Id.* at 16-17).[2]

Plaintiffs cannot explain why they misrepresented this evidence, but it is obvious; when viewed in full context, the materials do not support the allegations in the CCAC. Rather than face the consequences of that fact — dismissal of the claims as to Benco — Plaintiffs argue that the Court must ignore the materials submitted by Benco and accept the patently unreasonable inferences that Plaintiffs try to draw from the doctored material. Plaintiffs are wrong on both

---

[1] Pettus's company, Dynamic Dental, owed Archer & White a debt through their joint venture partnership but as of 2009 would never pay it, having sold certain of its assets to Benco and gone out of business. Benco Mem. at 10-12.

[2] Other examples of similar conduct by Plaintiffs are found throughout Benco's opening brief.

points. The law does not allow Plaintiffs to avoid dismissal by this type of deceptive "clever drafting."

      A.      The Court May Properly Consider The Transcripts and Documents Submitted By Benco.

Benco cited numerous cases in its opening brief supporting the Court's ability to consider the materials at issue when ruling on a motion under Rule 12(b)(6) without the need to convert the motion into one for summary judgment. Benco Mem. at 4-5. In addition to those cases, Plaintiffs themselves have cited to a case that explains the reasoning why a court may consider the full context of materials that a plaintiff quotes or relies upon in crafting a complaint. In *In Global Network Communications, Inc.*, the Second Circuit explained that when a plaintiff takes the path of relying upon a document in support of the complaint, but fails to attach it to the complaint, that is "usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claims." 458 F.3d at 157 (citation omitted).

This doctrine fully supports the rationale behind the Supreme Court's decision in *Twombly*, which clarified that under Rule 8(a), a complaint must contain sufficient facts to suggest that a plaintiff's claims are plausible. *Twombly* was specifically concerned with the burden and expense imposed upon defendants in complex antitrust actions. *See Twombly*, 550 U.S. at 559 (citations omitted) (describing the "potentially enormous expense of discovery"). The pleading requirements in *Twombly* were intended to screen out meritless cases to avoid imposing those burdens on litigants. *Id.* In this case, Plaintiffs have created sham facts to appear to comply with *Twombly* while pursuing extraordinarily burdensome discovery upon Benco and its co-defendants. The Court should put an end to this.

Contrary to Plaintiffs' assertions, the Court's consideration of materials relied upon to form the complaint is not limited to contracts, securities filings, or the like. *See L-7 Designs, Inc.*

5

*v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (citation omitted) (analogizing to Rule 12(b)(6) and holding that when ruling on a motion under Rule 12(c), the court could properly consider letters exchanged between the parties that plaintiffs had not attached to the complaint because they were " 'integral" to the negotiation exchange that [plaintiff] identified as the basis for its Complaint"); *Washington v. Gonyea,* 538 F. App'x 23, 25 & n.3 (2d Cir. 2013) (citation omitted) (finding that the district court could review full transcript of a disciplinary proceeding that contradicted and defeated plaintiffs' due process claims); *Lobaito v. Chase Bank*, 529 F. App'x 100, 101–02 (2d Cir. 2013) (citations omitted) (finding that the district court could consider numerous exhibits attached to a motion to dismiss claims that broker was subject to unfair FINRA arbitration); *Lopez-Serrano v. Rockmore*, 132 F. Supp. 3d 390, 400 (E.D.N.Y. 2015) (citations omitted) (considering full content of text messages which were partially quoted in the complaint); *St. John's Univ. v. Bolton*, 757 F. Supp. 2d 144, 153 n.2 (E.D.N.Y. 2010) (citation omitted) (considering Ph.D. dissertation and research documents that were integral to the complaint). The cases cited by Plaintiffs do not override this solid body of precedent.[3]

---

[3] Plaintiffs' reliance upon the *dicta* in *Sahu v. Union Carbide Corp.,* 548 F.3d 59 (2d Cir. 2008), is misguided for a number of reasons. In *Sahu*, the district court *sua sponte* converted a motion to dismiss into a motion for summary judgment, and the only question before the Second Circuit was whether the district court had given adequate notice of that conversion as required by Fed. R. Civ. P. 12(d) prior to granting summary judgment against plaintiff. *Id.* at 64–65. The Second Circuit did not need to rule on the issue of whether the materials included with the motion to dismiss could properly be considered by the court absent such conversion. Furthermore, the facts in *Sahu* are not comparable to the facts here. The Second Circuit described the complaint as making only "limited references" to materials outside of the complaint and noted that such limited references were not sufficient to incorporate a host of documents from prior litigation into the complaint. *Id.* at 67–68 (citation omitted). Here, Plaintiffs' reliance upon the materials at issue was not limited; it was sweeping. And the allegations based upon these materials are not mere surplusage; they are necessary to state a claim for relief against Benco.

Finally, it is doubtful that the *dicta* in *Sahu* is even still persuasive authority. *Sahu* was decided before the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and draws a distinction between what is required to state a claim under Fed. R. Civ. P. 8(a) ("a short and plain statement of the claim"), and what is required by *Twombly* – sufficient allegations of fact to show the claim to be plausible – that was superseded by *Iqbal*. *Sahu* at 68. As authority, *Sahu* cited to the Second Circuit's 2008 decision in *Boykin v. KeyCorp*, 521 F.3d 202, 213 (2d Cir. 2008). In *Boykin,* the Second Circuit explained that there was "some uncertainty" about the application of *Twombly* to Rule 8(a) outside of the antitrust context. 521 F.3d at 213. *Boykin,* therefore followed the Second Circuit's then-recent decision in *Iqbal v. Hasty*, 490 F.3d 143, 155 (2d Cir. 2007), *rev'd and remanded sub nom. Ashcroft v. Iqbal*, 556 U.S. 662 (2009), holding that *Twombly* did not set forth a "universal standard" for pleading. 521 F.3d at 213. Of course, the Supreme Court then reversed the Second Circuit's decision in *Iqbal*, making clear that *Twombly* did, in

6

This case presents a textbook example of why this rule is in place. Plaintiffs misrepresented that the Archer Complaint concerned distributors other than Schein and Burkhart — thus suggesting Benco's (and/or Patterson's) participation in the alleged margin fixing agreement. Benco Mem. at 7. But it is readily apparent that neither Benco nor Patterson was implicated in any way in the alleged "margin fixing" agreement described in the Archer Complaint. *See* Benco Mem. at 6-7; *see generally* Benco Mem. Exh. A.[4]

Plaintiffs then assert that Benco Managing Director Charles Cohen's offer of payment to Archer & White raises an inference that Benco was a participant in the alleged margin fixing agreement, because, they assert, there was no reason why Cohen would make that offer unless Benco was a participant in the alleged "overarching conspiracy." CCAC ¶ 72. But Plaintiffs' argument runs against the rocks when this short conversation is considered in full. Cohen, in the conversation quoted in the Complaint, refers to a "debt" to be resolved. Plaintiffs intentionally tried to hide Cohen's reference to that debt. They also tried to shield the Court from Cohen's further explanation that he did not want Skip Pettus, the former owner of Dynamic Dental, to join Archer & White in suing Schein and Burkhart, now that Pettus was a Benco employee and had sold certain assets of Dynamic Dental such that Dynamic would never be able to repay Archer & White the debt owed. In full and in context, Plaintiffs' suggestion that there is no reasonable business justification for Cohen's alleged offer, when Cohen makes specific reference to an existing debt (which Archer does not dispute), becomes unreasonable. Plaintiffs' leap in

---

fact, set forth a universal pleading standard under Rule 8(a). 556 U.S. at 684. In short, the only case from which the *dicta* in *Sahu* derives was reversed by the Supreme Court.

[4] In addition to considering the Archer Complaint because it was relied upon in framing the CCAC, this Court may take judicial notice of this document. "A court may take judicial notice of a document filed in another court [. . .]." *Global Network*, 458 F.3d at 157 (citation and internal quotations omitted). "If the court takes judicial notice, it does so in order to determine what statements they contained—but again not for the truth of the matters asserted." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (internal quotations and alterations omitted). In this case, the Court could take judicial notice of what the Archer Complaint *does not contain* — any allegation implicating Benco or Patterson in the alleged margin fixing agreement.

7

logic that the offer must have been made to shield Benco's participation in the alleged margin-fixing agreement is disingenuous.

Finally, Plaintiffs materially altered a quote from a Benco internal email to make it sound as if Benco had entered into an agreement with Patterson concerning competition between Benco and Patterson on their sales of Pelton & Crane products. Benco Mem. at 15-17. Plaintiffs claim that the original quote is ambiguous and supports their proffered interpretation when considered in light of their allegations concerning Benco's participation in the alleged "overarching conspiracy." Plaintiffs' Opposition to Motions of Defendants to Dismiss the CCAC ("Pls' Mem.") at 24-25.[5] If that is true, one is left to wonder: Why did Plaintiffs alter the quote to begin with? Because they know that what they are claiming is not true. Furthermore, to the extent the pulled quote may be ambiguous (and it is not), that ambiguity is eliminated when taking the quote in the context of the document as a whole. *See* Benco Mem. at 15-17. In full and in context, it would be unreasonable to view this document as supporting any inference of agreement between Benco and Patterson (or any other distributor).

In sum, there is no specific, non-conclusory allegation raising a reasonable inference that Benco (or Patterson) participated in the alleged margin-fixing agreement,[6] alone or as part of the

---

[5] Plaintiffs' argument that Benco's Consent Judgment in Texas somehow supports their proffered interpretation of this email is wrong. First, the facts alleged by Texas related solely to the alleged boycott of the Texas Dental Association meeting in 2014. There was nothing alleged by Texas that related in any way to Plaintiffs' "margin fixing" claims. Second, Benco agreed to enter into the Consent Judgment but did not admit to any facts alleged by Texas. Third, Benco was not fined as a result of that action, but only agreed to reimburse Texas for the cost of the investigation. CCAC ¶ 173. It was not a guilty plea, and Plaintiffs' attempt to equate it with a guilty plea, by citing *In re Air Cargo Shipping Services Antitrust Litigation*, No. 06-MD-1775, 2009 WL 3443405, *1 (E.D.N.Y. Aug. 21, 2009) (finding criminal guilty pleas to price fixing charges supported conclusion that civil price-fixing claim should not be dismissed), is wrong. *See* Pls' Mem. at 25 n.23.

[6] Plaintiffs claim that there are allegations that all defendants participated in group boycotts of Archer & White, citing paragraphs 100-118 of the CCAC. The ***only*** mention of Benco in those paragraphs is a single claim that 15 years ago, ***in 2001,*** seven years before the start of the class period, Benco and Patterson threatened KaVo Dental as a result of Archer & White's discounted prices. CCAC ¶ 118. This allegation does not implicate Benco in the claimed 2008-present "overarching conspiracy" alleged in the CCAC. Plaintiffs elsewhere cite to paragraph 119 as implicating Benco in alleged threats related to Archer & White's sales of DentalEZ equipment. There is no allegation as to when that supposedly took place. Given the time period covered by the Complaint, this too could

8

claimed "overarching conspiracy" not to compete on price.[7] Although "Plaintiffs' Sherman Act does not 'stand or fall' on any one evidentiary source material," Pls' Mem. at 9, it certainly falls without support from *any* of the evidentiary source material.[8]

### B. The Court Need Not Accept Plaintiffs' Unreasonable Characterization Of The Materials Or Their Unreasonable Inferences.

Plaintiffs cite to cases holding that a court is not permitted to choose between competing inferences when ruling on a motion to dismiss. Pls' Mem. at 7-8. But those cases and that body

---

have been well before the relevant period in this case and does not support Plaintiffs' claims. There is nothing in the CCAC that suggests communication or coordination between Benco and its competitors in 2001, or ever, related to the alleged boycotts supposedly directed at Archer & White.

Such specific allegations are necessary here because it is indisputable that distributor complaints to manufacturers about price-cutting competitors are common and perfectly legal. *See generally Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 763–64 (1984). It is also legally recognized that manufacturers have a unilateral economic interest in encouraging distributors "to invest in tangible or intangible services or promotional efforts that aid the manufacturer's position as against rival manufacturers," *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 890 (2007), by imposing price and non-price restraints on the sales of their product – such as limiting the number of distributors in a region. *Id*. at 903–04. For the same reason the Second Circuit has held that "[e]vidence of pricing suggestions, persuasion, conversations, arguments, exposition, or pressure is not sufficient to establish the coercion necessary to transgress § 1 of the Sherman Act." *Acquaire v. Canada Dry Bottling Co.*, 24 F.3d 401, 410 (2d Cir. 1994) (citation omitted).

Thus, Plaintiffs' conclusory, blanket statements that (1) Defendants' alleged complaints to manufacturers would make no sense if made unilaterally (Pls' Mem. at 30), and (2) "Manufacturers in a competitive market are incentivized to sell to discounting distributors because those distributors pay higher prices for the manufacturers' products and sell the products at lower prices, resulting in higher sales," *Id*., need not be credited by the Court because they conflict with judicial experience and common sense. *Iqbal*, 556 U.S. at 679.

[7] In fact, as Benco noted in its opening brief, at the time they filed the complaint, Plaintiffs quoted from materials that included supposed statements from Schein noting that when Benco entered new markets, it would sell at low prices for the first three years to gain market share. Benco Mem. at 8-9. This completely undermines Plaintiffs' allegation, "based upon information and belief," that Benco joined the alleged cartel as a result of threats that unless it raised prices, industry participants would "cut them off." CCAC ¶ 47. Plaintiffs' response to this critical flaw in their theory – that a repeated pattern of multi-year price cutting to gain share at the expense of Benco's competitors is nothing more than "cheating" on the alleged "overarching conspiracy" not to compete on price (Pls' Mem. at 22 n.23) – cannot be taken seriously.

[8] As another example of drawing unreasonable inferences from known source materials, in their Opposition Brief, Plaintiffs contend that a comment by a manufacturer that it had received complaints from "the Scheins of the world" plausibly implicates Benco. Pls' Mem. at 33. While Plaintiffs contend that their allegation that "Defendants comprise nearly 90 percent of the relevant market," CCAC ¶ 126, supports that inference, earlier in the CCAC they more precisely alleged that "Henry Schein currently hold[s] 41% of the market, Patterson 34%, and Benco 10%." CCAC ¶ 2. The CCAC also makes allegations related to the selling of medical supplies, ¶ 157, but names only Schein and Patterson in those allegations because Benco does not sell medical supplies. Moreover, this Court may take judicial notice of the fact that Schein and Patterson (but not Benco) are publically traded companies, and the CCAC correspondingly alleges publicly available financial data for Schein and Patterson, CCAC ¶ 178 (table), but not Benco. It is not reasonable to infer that an ambiguous statement about "the Scheins of the world" implicates Benco—a private dental-only company with less than a quarter of Schein's dental market share, where Schein also operates significant medical and veterinary arms.

of law are inapposite here. Benco does not ask the Court to draw competing inferences from this evidence. What Benco shows, however, is that the inferences that Plaintiffs want the Court to draw are *unreasonable* and need not be credited by the Court. The Court must "draw on its judicial experience and common sense" and need only draw "reasonable inferences" in Plaintiffs' favor. *Iqbal*, 556 U.S. at 678–79. Furthermore, absent these allegations, the CCAC does not contain sufficient factual allegations to state a plausible claim that Benco participated in the alleged "margin fixing" agreement or the alleged overarching conspiracy.

    C.    Allegations That Defendants Earned "Supra-Competitive" Profits Describe A Legal, Functioning Oligopoly And Does Not Raise An Inference Of Conspiracy.

Plaintiffs claim that Defendants set similar high margins on their sales, "earned supra-competitive profit margins" over a long period of time, "took action against their own interests (absent a conspiracy) by not competing on price," and that that is evidence of the alleged overarching conspiracy. But again, they are wrong. Plaintiffs themselves admit that this market is "highly concentrated," with the Defendants collectively holding between 80% – 90% of the market. CCAC ¶ 2. Such industries are described as oligopolies. In an oligopoly, "any rational decision must take into account the anticipated reaction of the other [] firms." *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 359 (3d Cir. 2004) (alteration in original) (quoting Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (2d ed. 2000) ¶ 1429, at 207); s*ee also Mayor of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 139 (2d Cir. 2013) ("Even reading the complaints in the light most favorable to Plaintiffs, as we must, these asserted facts lead to only one plausible inference: these are actions taken by market actors who are aware of and anticipate similar actions taken by competitors, but which fall short of a tacit agreement." (internal quotation omitted)). As the Supreme Court has recognized, it is "not in itself unlawful" for firms employing oligopolistic rationality to "set[] their prices at a profit-maximizing, supracompetitive

10

level by recognizing their shared economic interests and their interdependence with respect to price and output decisions." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993) (citations omitted).

Thus, conscious parallelism is as consistent with interdependent, oligopolistic pricing as with illegal collusion. *See Id.*; *Citigroup*, 709 F.3d at 139. An allegation of parallel, oligopolistic pricing, therefore, says nothing about whether such pricing was the result of a conspiracy or, rather, legitimate conduct by firms in an oligopoly. *See, e.g.*, *In re Flat Glass*, 385 F.3d at 359–60; *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 876–77 (7th Cir. 2015). Under Plaintiffs' theory, every oligopoly would be subject to claims of conspiracy and subject to full-blown discovery, based upon conduct (oligopolistic pricing) that is common and not violative of antitrust laws. In toto, the CCAC does not allege facts from which one could reasonably infer that Benco entered into any "margin fixing" agreement or "overarching conspiracy" with Patterson, Burkhart or Schein.

II. THE CCAC DOES NOT RAISE A REASONABLE INFERENCE THAT BENCO PARTICIPATED IN A "NO-POACHING" OR "CUSTOMER ALLOCATION" AGREEMENT.

Plaintiffs' allegations of a no-poaching agreement among Defendants and Burkhart — *i.e.,* an agreement among the Defendants not to "poach" each other's employees — are insufficient to support the existence of such an agreement or the alleged overarching conspiracy. Benco. Mem. at 20-21. The only non-conclusory fact pled in support of this claim was a citation to a message from Benco to Schein relating that Benco had hired a sales representative that Schein had previously fired. CCAC ¶ 77. Nothing in the CCAC raises a reasonable inference that Patterson or Burkhart were parties to the agreement described in that message.

Plaintiffs' response only confirms Benco's position, and Plaintiffs' citations to the CCAC offer no support for this claim. Plaintiffs cite paragraph 5 of the CCAC to explain the "logic" of

11

the alleged "no-poaching agreement." Pls' Mem. at 6. Paragraph 5 of the CCAC describes a multistep chain of causation: (1) the "'no-poach agreement' supported and bolstered the customer allocation agreement"; (2) "which in turn supported and bolstered the [. . .] overarching agreement not to compete on price." CCAC ¶ 5. This "logic" fails because, in addition to the absence of any facts suggesting that Patterson or Burkhart were part of the alleged "no-poach" agreement, the CCAC offers no facts from which one could reasonably infer that *any* of the Defendants entered into a "customer allocation" agreement — which is a necessary intermediate link in Plaintiffs' alleged multistep causal chain.

A "customer allocation agreement" would be one where the parties to the agreement refrain from seeking business from other parties' customers. However, the CCAC does not identify a single instance of customer allocation. For this reason alone, even on Plaintiffs' own theory, the CCAC fails to sufficiently tie the alleged "no-poaching" agreement between Schein and Benco to the alleged overarching agreement not to compete on price.

Plaintiffs then cite to wholly irrelevant allegations in the CCAC to support the existence of the alleged "no-poaching agreement." Plaintiffs first identify paragraphs 100 to 109 of the CCAC as instances of Defendants "carrying out" the supposed "no-poaching" agreement. *See* Pls' Mem. at 6. These paragraphs do not concern alleged non-poaching of employees, but are — expressly and self-admittedly — supposed instances of "group boycott" activity. *See, e.g.,* CCAC ¶ 100 ("Another example of Cartel Members group boycott"). Paragraphs 100 to 109 allege a threatened boycott of a manufacturer, Instrumentarium, by Schein and Patterson (Benco is not mentioned here), supposedly following Archer & White/Dynamic Dental's low pricing on Instrumentarium's products. Nothing in these paragraphs relates to any agreement among Defendants not to poach each other's employees. Nor do these relate to any supposed "customer

12

allocation agreement" among the Defendants. There are also no allegations that Defendants or Burkhart — the alleged members of the "customer allocation agreement" — complained about *each other's* sales to customers that were allegedly "allocated" to another distributor under the supposed agreement. In fact, the CCAC's allegations affirmatively refute the conclusory allegations of any "customer allocation agreement" among the Defendants. *See* CCAC ¶ 103 (noting that Schein, Patterson and Burkhart were all quoting equipment prices for the same doctor who was "shopping price with all of the local dealers in the Sacramento area").

Plaintiffs' other citations to the record fare no better. Plaintiffs later state that "[t]he CCAC further alleges that all three Defendants coordinated group boycotts of distributors that refused to abide by the Cartel's no-poach "rules."" Pls' Mem. at 13 (citing to CCAC ¶¶ 100-121). But paragraphs 110 through 121, as with paragraphs 100 to 109 described above, do not concern the alleged no-poaching of employees or customers. They, too, concern alleged group boycott activity directed at Archer & White as a result of Archer & White's discounted pricing. *See* CCAC ¶¶ 111-121. Archer & White is nowhere identified as a party to the alleged no-poaching agreement or the alleged customer allocation agreement, let alone as a target for punishment for failing to adhere to the terms of the alleged agreements. Therefore, there is no reasonable basis to infer from the allegations in the CCAC that all of the Defendants entered into the alleged non-poaching agreement or that any of the Defendants was a party to the alleged customer allocation agreement.

Thus, under Plaintiffs' own logic, there are no facts pled raising an inference that Defendants entered into a "no-poach" or "customer allocation" agreement that supported the claimed "overarching conspiracy."

III. THE CCAC DOES NOT STATE A CLAIM BASED UPON THE SOURCEONE ALLEGATIONS.

Try as they may, Plaintiffs still cannot escape the fact that, based upon their own pleadings, they cannot state a nationwide class-action claim against Benco or the other Defendants based upon the allegations relating to SourceOne and the alleged boycotts of the Texas and Arizona dental association meetings. As Benco explained, Plaintiffs, including the proposed class representatives, have specifically pled that unless SourceOne became a full line distributor, *there would be no effect on prices.*

> [O]ther dental supplies and equipment distributors cannot discipline Defendants' pricing power *unless* they offer as full and comprehensive a product line as do Defendants. If a rival distributor offers lower prices but a narrow product line, requiring a dentistry practice to continue to order from multiple other distributors or individual manufacturers to fill any "gaps" in the rival's product offering, then that rival presents dentistry practices with the same problems associated with purchasing from individual manufacturers.

Complaint in *Evolution Dental Science LLC v. Benco Dental Supply Company, et al.*, No. 1:16-cv-596, ECF No. 1, at ¶ 23; *see also* Benco. Mem. at 23. The CCAC does not allege that SourceOne had, or shortly would have, a "full and comprehensive" product line. Plaintiffs did allege that SourceOne had a "wide ranging" product line, but in this market that is not the same. Nowhere do Plaintiffs allege that SourceOne had or was likely to immediately[9] offer a "full and comprehensive" product line nationwide. Thus, Plaintiffs have not stated a claim for relief based upon the SourceOne allegations. Absent those allegations, the CCAC does not plead facts sufficient to suggest that SourceOne's business could have had a downward impact on prices nationwide or that SourceOne's failure had any impact on the class. Plaintiffs nowhere confront

---

[9] The CCAC alleges that from 2013 to 2015 only seven states considered a partnership with SourceOne: Texas, Arizona, Colorado, California, Virginia, Louisiana, and Nevada. CCAC ¶¶ 131-138.

Benco's argument head on, and Plaintiffs' legal arguments and cited cases are irrelevant to Benco's argument that Plaintiffs have pled inadequate facts to state a claim.[10]

## CONCLUSION

For the reasons stated above, all claims against Benco Dental Supply Company alleged in the Consolidated Class Action Complaint should be dismissed in their entirety, with prejudice.

                                                      BUCHANAN INGERSOLL & ROONEY PC
*Attorneys for Defendant Benco Dental Supply Company*

Dated: June 15, 2016          By:    /s/ *Howard D. Scher*
                                                            HOWARD D. SCHER (HS-0966)
                                                            *howard.scher@bipc.com*
                                                            Two Liberty Place, 32nd Floor
                                                            50 South 16th Street
                                                            Philadelphia, Pennsylvania 19102-2555
                                                           T: (215) 665-8700
                                                           F: (215) 665-8760

---

[10] *Robb v. Connecticut Board of Veterinary Medicine*, No. 15-cv-906, 2016 WL 236209, at *8 (D. Conn. Jan. 20, 2016), concerns Article III standing, not whether Plaintiffs have pled themselves out of court. Moreover, Plaintiffs have misquoted *Robb*, which reads, "it is not the case the a plaintiff lacks standing *ipso facto* when his alleged injury stems from the potential future effects of yet-to-occur *government* action." *Id*. (italicized language omitted by Plaintiffs). *Higgins v. New York Stock Exchange,* 775 F. Supp. 113, 116 (S.D.N.Y. 1991), considered when the statute of limitations starts to run on a claim, and has no bearing here. *New York Citizens Committee on Cable TV v. Manhattan Cable TV, Inc.*, 651 F. Supp. 802, 811 (S.D.N.Y. 1986), is also a standing case and irrelevant here. Whether or not "consumers have standing when they are injured" says nothing about whether Plaintiffs here have sufficiently pled injury. *Bon-Ton Stores, Inc. v. May Department Stores Co.*, 881 F. Supp. 860, 862 (W.D.N.Y. 1994), addresses whether a preliminary injunction requested by a department store should issue to prevent a planned takeover of a rival store by large national chain. This too sheds no light here. *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 656 (2d Cir. 2015), another preliminary injunction action, concerns whether the government had sufficiently established the likelihood of harm from drug manufacturer's plan to stop selling a twice-daily version of its drug that had gone off-patent and replace it with a still patent-protected once-a-day version of the drug. *McWane, Inc. v. F.T.C.*, 783 F.3d 814, 838 (11th Cir. 2015), reviewed an order by the FTC under section 5 of the Federal Trade Commission Act finding that a manufacturer had unlawfully maintained a monopoly. It is inapposite to this review of a motion to dismiss a private Sherman § 1 claim. Similarly, *LePage's Inc. v. 3M*, 324 F.3d 141, 159 (3d Cir. 2003), was an appeal from a judgment against a manufacturer for violations of the Sherman Act's monopolization provision. It is inapposite to review of the sufficiency of a Section 1 conspiracy claim. Finally, while *Castro v. Sanofi Pasteur Inc.*, No. 11-cv-7178, 2012 WL 12516572, at *6 (D.N.J. Aug 6, 2012), did review a motion to dismiss both Section 1 and Section 2 claims, the claim was against a vaccine manufacturer that held monopoly power in the markets for the sale of five separate vaccines that it had used predatory bundling to stifle price competition from the only other manufacturer of one of the vaccines (and who only sold that vaccine). That market, where barriers to entry included a 15-year FDA approval process, and that theory of competitive injury (within a two-firm market), are fundamentally different from the allegations here, where hundreds of distributors compete to sell thousands of dental supply products. Thus, the generic statement about reduced competition quoted by Plaintiffs therefrom adds nothing to their implausible theory of injury.

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 15, 2016, I caused to be electronically filed the foregoing Reply Memorandum of Law in Support of Benco Dental Supply Company's Motion to Dismiss The Consolidated Class Action Complaint via CM/ECF. Notice of this filing will be sent by email to all parties by operation of the court's electronic filing systems. Parties may access the filing through the Court's CM/ECF System.

/s/ Jackson E. Warren
Jackson E. Warren